468

GEORGE W. DUNNE, President of the Board of Commissioners and Chief Executive Officer of the County of Cook, *et al.*, Plaintiffs-Appellees, *v.* THE COUNTY OF COOK, Defendant (Carl H. Hansen *et al.*, Defendants-Appellants).

First District (4th Division)   No. 83—661

Opinion filed April 12, 1984.

LINN, P.J., dissenting.

Jerome H. Torshen and James T. Ryan, Special State's Attorneys, and Timothy R. Conway, of Greenberger, Krauss & Jacobs, Chartered, both of Chicago (Abigail K. Spreyer, of counsel), for appellants.

Jerold S. Solovy, Special State's Attorney, and Barry Sullivan and Joel T. Pelz, both of Jenner & Block, both of Chicago, for appellees.

JUSTICE JIGANTI delivered the opinion of the court:

The president of the county board of Cook County possesses the statutory authority to veto ordinances enacted by the county board. (Ill. Rev. Stat. 1981, ch. 34, par. 908.) Also pursuant to statute, four-fifths of the members elected to the board may pass an ordinance over the president's veto. (Ill. Rev. Stat. 1981, ch. 34, par. 908.) On January 17, 1983, the board approved an ordinance which changed the majority vote necessary to override an executive veto from four-fifths to three-fifths. The ordinance specifically stated that it was to supersede the State statute which was enacted in 1887 and which established the four-fifths override requirement. (Ill. Rev. Stat. 1981, ch. 34, par. 908.) The board's purported authority to enact the ordinance stems from the home rule provisions of the 1970 Illinois Constitution. See generally Ill. Const. 1970, art. VII, sec. 6.

On January 20, 1983, the president of the county board, George Dunne, vetoed the override ordinance. On January 25, 1983, 14 of the 17 members of the board, a four-fifths majority, voted to enact the ordinance over the veto of the president. On January 26, 1983, Dunne filed a declaratory judgment action in the circuit court of Cook County, seeking to find the ordinance unconstitutional under the 1970 Illinois Constitution. Dunne, who is also a member of the board, and two other commissioners are the plaintiffs (collectively referred to as the President) in this action; the defendants (collectively referred to as the Board) are the 14 commissioners who voted in favor of the override ordinance. On March 14, 1983, the trial court granted the President's motion for summary judgment, finding that the ordinance was an unconstitutional enactment that was therefore "null and void." This appeal followed.

The constitutional powers of Cook County are derived from article VII of our State's constitution. Under section 6(a) of article VII, Cook County is a home rule unit which "*** may exercise any power and perform any function pertaining to its government and affairs ***." These general powers are modified by certain other

provisions of section 6.[1] The first issue in this appeal revolves around section 6(f) which provides generally that home rule units may only "adopt, alter or repeal a form of government" by referendum. The President contends that the ordinance changing the majority vote necessary to override an executive veto from four-fifths to three-fifths is a change in the form of government and consequently may only be accomplished by a referendum. A referendum was not conducted to approve the ordinance at issue in the case at bar.

The Illinois Supreme Court has helped to define the constitutional meaning of the term "form of government" in two cases decided within 1½ months of each other. As an overview to the following discussion, one of the cases held that a change in the form of government had occurred (*Pechous v. Slawko* (1976), 64 Ill. 2d 576, 357 N.E.2d 1144), while the other case found that such a change was not present (*Allen v. County of Cook* (1976), 65 Ill. 2d 281, 357 N.E.2d 458).

In the *Pechous* case, a statute provided that the mayor of the city of Berwyn possessed the authority to appoint and remove certain village officers. (Ill. Rev. Stat. 1975, ch. 24, pars. 3—7—1, 3—7—2, 3—7—5.) The city council enacted an ordinance which removed those officers and appointed their replacements. The supreme court found that the council's attempt to transfer the appointment and removal power from the executive to the legislative branch of government constituted a change in the form of government under section 6(f).

---

[1]The pertinent provisions of section 6 read:

"Sec. 6. Powers of Home Rule Units

(a) A County which has a chief executive officer elected by the electors of the county and any municipality which has a population of more than 25,000 are home rule units. Other municipalities may elect by referendum to become home rule units. Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt.

\* \* \*

(f) A home rule unit shall have the power subject to approval by referendum to adopt, alter or repeal a form of government provided by law, except that the form of government of Cook County shall be subject to the provisions of Section 3 of this Article. A home rule municipality shall have the power to provide for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law. A home rule county shall have the power to provide for its officers, their manner of selection and terms of office in the manner set forth in Section 4 of this Article."
Ill. Const. 1970, art. VII, secs. 6(a), (f).

In reaching its holding, the court rejected the council's argument that a change in the form of government under section 6(f) occurs only when the "basic nature of government" is altered. Rather, the court observed that "the Constitution does not speak of changes in 'the basic nature of government' " (*Pechous v. Slawko* (1976), 64 Ill. 2d 576, 581, 357 N.E.2d 1144, 1148), and cited a Report of the Committee on Local Government of the Constitutional Convention of 1970 which stated in part that " '*** more than the manner of electing the county board is included within the meaning of "form of government." It also includes the relative powers and functions of the county board and the chief executive officer of the county. ***.' " *Pechous v. Slawko* (1976), 64 Ill. 2d 576, 582, 357 N.E.2d 1144, 1148.

The Committee Report cited by the court further stated that the term "form of government" contemplates that the General Assembly will provide for various patterns of county and municipal administrative organization. The *Pechous* court found that such a statutory pattern applied to the form of municipal government in Berwyn. Berwyn was an incorporated municipality governed under article 3 of the Illinois Municipal Code. (Ill. Rev. Stat. 1973, ch. 24, art. 3.) Article 3 provided for a statutory pattern where the mayor was the chief executive officer of the municipality. (Ill. Rev. Stat. 1973, ch. 24, par. 3—4—4.) A municipality could elect by referendum to alter this pattern of government and become either a "managerial form of municipal government" under article 5 of the Code or a "commission form of municipal government" under article 4. (Ill. Rev. Stat. 1973, ch. 24, arts. 4, 5.) Berwyn had not elected either one of these alternative patterns of government. As the court stated in *Pechous*, "[d]ifferent relationships between the legislative and executive branches of municipal government are provided" under articles 3, 4 and 5 of the Code. (*Pechous v. Slawko* (1976), 64 Ill. 2d 576, 583, 357 N.E.2d 1144, 1148.) Under article 3, the mayor possessed the power of appointment and removal. Therefore, the court found that under the statutory pattern which governed Berwyn it would be a change in the form of government for the city council to transfer the appointment power from the executive to the legislative branch of government. Consequently, the *Pechous* decision was predicated upon a statutory pattern established by the legislature which defined the relative powers and functions of the executive and legislative branches.

Dumke v. Anderson was a companion case which was consolidated with the *Pechous* appeal. Dumke v. Anderson concerned an attempt by the board of trustees of the village of Oak Lawn to appropriate to itself the power to appoint a legal advisor for the village. The village

had previously adopted a managerial form of government under article 5 of the Municipal Code and one significant characteristic of such a form of government is that the municipal manager is the administrative head of the municipal government. (Ill. Rev. Stat. 1975, ch. 24, par. 5—3—7.) The board of trustees had only legislative powers; it had no powers with respect to administration. (Ill. Rev. Stat. 1975, ch. 24, par. 5—3—6.) Although the statute did not specifically provide that the village manager possessed the power of appointment, the supreme court found that the board's attempt to appoint a legal advisor encroached upon the authority of the village manager. In support of its conclusion, the court cited 56 Am. Jur. 2d *Municipal Corporations* sec. 186 (1971), which states that a city council in a city manager form of government does not and should not attempt to dictate or confirm the appointments of city officers and employees. The power to appoint a legal advisor, therefore, was an element of the form of government in the pattern adopted by the legislature, even though the statute did not specifically so provide.

*Allen v. County of Cook* (1976), 65 Ill. 2d 281, 357 N.E.2d 458, was handed down by the supreme court shortly after the *Pechous* decision. In *Allen*, an existing State statute provided that sums of money in excess of $2,500 could not be appropriated absent a two-thirds vote of the members comprising the Board of Commissioners of Cook County. The Board enacted an ordinance which was "specifically intended to supersede" the statute and provided that sums in excess of $5,000 could not be appropriated unless a simple majority, as opposed to a two-thirds majority, of the Board members approved the appropriation. At the time of the action, the Board was composed of 10 members who were elected from the city of Chicago and six members who were elected from areas of Cook County outside of Chicago. This two-district method of election was established in the 1870 Illinois Constitution (Ill. Const. 1870, art. X, sec. 7) and later preserved in the 1970 Constitution (Ill. Const. 1970, art. VII, sec. 3(c)). The six suburban members of the Board argued that the new appropriation ordinance changed the relative powers between the city and suburban commissioners because, in contrast to actions allowable under the State statute, substantial amounts of money could be appropriated under the ordinance without the consent of the suburban members. Therefore, the suburban commissioners contended that a change in the form of government had occurred under section 6(f). However, the supreme court rejected this argument and found that because neither the two-district method of electing commissioners from Chicago and from outside of Chicago nor the number of Board members to be

elected from those districts was altered, adoption of the ordinance did not constitute a change in the form of government under section 6(f).

Our examination of *Pechous* and *Allen* reveals that while the supreme court has never established a definitive standard as to what actions constitute a change in the form of government under section 6(f), several guidelines have been offered. Both cases suggest certain actions that do not fall within the ambit of a change in the form of government. Under *Allen*, it is not a change in the form of government for a legislative branch of government, such as the Board, to alter the relative voting powers between its own city and suburban commissioners in certain instances. *Pechous* states that a change in the form of government does not necessarily mean that "the basic nature of government" has to be altered. Both cases also offer suggestions regarding actions which would in fact constitute a change in the form of government under section 6(f). *Allen* states that such a change would be accomplished if the two-district method of electing commissioners or the number of commissioners elected from the city and outside of the city was altered. *Pechous* observes that " '*** the relative powers and functions of the county board and the chief executive officer of the county ***' " must be considered. (*Pechous v. Slawko* (1976), 64 Ill. 2d 576, 582.) We further learn from *Pechous* that a change in the form of government can occur when a legislative branch of a home rule unit attempts to transfer to itself the powers previously possessed by the unit's chief executive officer. A related question which was controlling under *Pechous* is whether the legislature has enacted a statutory scheme which distinguishes one pattern of government from another. This discussion leads us now to the manner in which *Pechous* and *Allen* affect the facts presented in the case at bar.

Both cases consolidated in *Pechous* and the case now before us concern specific statutory schemes where the legislature set a statutory pattern establishing the relationship between the executive and legislative branches of government. In *Pechous*, the power of the executive officer to appoint and remove certain officers was an essential distinction between alternative patterns of municipal government that could be chosen by a municipality. Similarly, in the case at bar, two separate statutes have been enacted by the legislature, one of which deals with Cook County and one of which addresses counties other than Cook County. (Ill. Rev. Stat. 1981, ch. 34, par. 701 *et seq.*; Ill. Rev. Stat. 1981, ch. 34, par. 901 *et seq.*) Both statutory patterns concern in many respects the relationship between the relative duties and powers possessed by a county's legislative body and its chief executive

officer. The statute addressing counties other than Cook County clearly excludes Cook County and is prefaced as "An Act to provide for the county executive *form of government in counties other than the County of Cook,* to define the powers, duties and functions of the chief executive officer of counties under the county executive form of government \*\*\*." (Emphasis added.) While the statute concerned with Cook County provides for a four-fifths override requirement, the statute dealing with counties other than Cook County sets out a three-fifths override provision. (Compare Ill. Rev. Stat. 1981, ch. 34, par. 710, with Ill. Rev. Stat. 1981, ch. 34, par. 908.) Where in *Pechous* the executive appointment power was an essential element which distinguished one type of municipal form of government from another, the four-fifths override requirement in the instant case appears to be one means by which the legislature set Cook County apart from other counties. *Pechous* found that where a pattern of government had been established by the legislature and then was altered by a legislative branch of a home rule unit, a change in the form of government had occurred under section 6(f). Similarly, in the case now before us, a pattern of government was established for Cook County which was distinguishable from the patterns set by the legislature for other counties in Illinois. The Board attempted to alter that pattern by enacting the override ordinance. By attempting to change the pattern set by the legislature which defined the relative powers between the executive and legislative branches of county government, we believe that the Board's action constituted a change in the form of government under *Pechous.*

The Board nonetheless argues that the override ordinance was not a change in the form of government under section 6(f). Specifically, the Board places primary emphasis upon *Allen* and argues that the "essential structure of Cook County government" refers only to the two-district method of board elections and the number of board members to be elected from each district. The Board also contends that the alteration of the President's veto power did not result in the abolition of the veto but was rather a reasonable action that preserved both the veto power and the balance of powers between the city and suburban commissioners. Under a close reading of *Allen* and *Pechous,* we fail to find the Board's arguments to be convincing.

It is true that *Allen* speaks of the two-district method of election and the number of board members to be elected from each district as one element of the form of government of Cook County. However, *Allen* was concerned only with a dispute concerning the legislative powers of the Board itself and the court had no reason to discuss the

relative powers of the Board *vis a vis* the powers of the county's chief executive officer. We cannot conclude from *Allen*, as the Board so urges, that the chief executive officer of Cook County plays no role within the form of government of Cook County. Thus, while the court delineated one element of the form of government in Cook County, it by no means set forth a blanket pronouncement that Cook County's form of government consists only of the manner in which the Board is elected. In *Allen*, the supreme court had no reason to address the other elements comprising the form of government in Cook County.

While *Allen* concerned the Board's attempt to alter its own internal powers, *Pechous* addressed the balance of historic tensions connecting the legislative and executive branches of county government. In the case at bar, as in *Pechous*, we also encounter a situation where the legislative branch of government has taken action to alter the relative powers possessed by the chief executive officer. The Board contends that their action was reasonable because the ordinance provided for a presidential veto that was similar to those possessed by other executive officers in Illinois and that their action did not border upon an attempt to emasculate an executive power; we think, however, that this argument misses the point. While on first impression one may conclude that an alteration in the form of government only concerns those changes which go to the very heart and spirit of governmental checks and balances, *Pechous* cautions that "the Constitution does not speak of changes in 'the basic nature of government.'" (*Pechous v. Slawko* (1976), 64 Ill. 2d 576, 581, 357 N.E.2d 1144, 1148.) Rather, the court in *Pechous* concluded that the drafters of the Constitution intended to include "'*** the relative powers and functions of the county board and the chief executive officer ***'" within the meaning of the term "form of government." (*Pechous v. Slawko* (1976), 64 Ill. 2d 576, 582, 357 N.E.2d 1144, 1148.) The case at bar presents an attempt by a legislative body to reduce the impact of an executive veto. Only by a thoroughly strained interpretation of *Pechous* could one conclude that such an action would not affect the relative powers between the legislative and executive branches of county government. Therefore, because both *Pechous* and the case at bar concerned disputes arising between the executive and legislative branches of county government and because both cases address specific statutory patterns encompassing certain executive powers as key elements, we believe *Pechous* controls this court's decision. Therefore, we find that the ordinance enacted by the Board was a change in the form of government under section 6(f).

The Board argues alternatively on appeal that it is not bound by

that portion of section 6(f) that requires a referendum to bring about a change in the form of government because section 6(f) further provides that "A home rule county shall have the power to provide for its officers, their manner of selection and terms of office in the manner set forth in Section 4 ***." (Ill. Const. 1970, art. VII, sec. 6(f).) Section 4(a) provides that a county's chief executive officer, the President, "shall have those duties and powers provided by law and those provided by county ordinance." (Ill. Const. 1970, art. VII, sec. 4(a).) When sections 6(f) and 4(a) are read together, the Constitution in effect states that a home rule county possesses the power to provide by county ordinance for the powers of its chief executive officer. Therefore, the Board contends that it could alter the President's veto powers by ordinance rather than by referendum, even if its action would bring about a change in the form of government.

■ We do not believe that the Board's interpretation of the Constitution is correct. To read the Constitution in the manner suggested by the Board would require it to effectively provide that a change in the form of government requires a referendum *unless* that change in any way concerns the powers of the county's chief executive officer. We believe that the proper interpretation of the Constitution requires that the first sentence of section 6(f), which states that a referendum is necessary to bring about a change in the form of government, is a general provision that prevails over the two subsequent sentences in that section. The first of those two sentences concerns certain powers of a municipality which are not at issue here. The second subsequent sentence concerns counties and allows that they may provide for their chief executive officer. We think that this sentence concerning counties may not contravene the first sentence of the section which requires a referendum to bring about a change in the form of government. To do otherwise, we believe, would nullify or greatly diminish the change in the form of government provision. As we discussed earlier, the ordinance at issue in this case constituted a change in the form of government which involved an attempt by the legislative branch of the county to reduce the veto power of the chief executive officer. Such an attempt would increase the legislative power to override an executive veto while decreasing the executive officer's power to have a presidential veto stand. We cannot believe that the framers of the Constitution intended to exempt such a situation from the referendum requirement of the form of government provision simply because it in some manner concerns a county officer's powers.

The Board argues that the supreme court found a referendum to be necessary in *Pechous v. Slawko* (1976), 64 Ill. 2d 576, 357 N.E.2d

1144, simply because the home rule units at issue were municipalities rather than counties. Specifically, the Board maintains that *Pechous* was decided under the second sentence of section 6(f) which provides that a home rule municipality has the power to "provide for its officers *** only as approved by referendum or as otherwise authorized by law." (Ill. Const. 1970, art. VII, sec. 6(f).) In contrast, the Board points out that counties such as Cook County are governed under the third sentence of section 6(f), a provision which contains no referendum requirement. We believe that the Board's interpretation of *Pechous* is incorrect.

■ A close reading of *Pechous* discloses that the court's holding was based upon and its analysis revolved around the change in the form of government provision of the first sentence of section 6(f). While passing mention was made of the section's second sentence, the court's discussion and ultimate decision centered around the constitutional meaning of the term "form of government" and the manner in which that term applied to the facts presented in the consolidated cases. We therefore believe that the distinction between counties and municipalities that has been advanced by the Board is inapplicable where a change in the form of government is found to be present. In other words, when such a change has occurred, the first sentence of section 6(f) applies and a referendum is necessary to carry out the proposed change. Because no referendum was conducted in the case at bar, we find that the ordinance has no legal effect.

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

JOHNSON, J., concurs.

PRESIDING JUSTICE LINN, dissenting:

The crucial issue in the instant case is whether the passage of a veto override ordinance reducing from four-fifths to three-fifths the majority vote necessary to override a presidential veto is an act changing the "form of government" of the county or, alternatively, is a home rule county's exercise of its power pertaining to its government and affairs (Ill. Const. 1970, art. VII, sec. 6(a)), including its power to "provide for its officers *** in the manner set forth in Section 4 of this Article." (Ill. Const. 1970, art. VII, sec. 6(f).) The authority for both these propositions is set forth in sections 6(a) and 6(f) of article VII, which read as follows:

"Sec. 6. Powers of Home Rule Units

(a) A County which has a chief executive officer elected by the electors of the county and any municipality which has a population of more than 25,000 are home rule units. Other municipalities may elect by referendum to become home rule units. Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs, including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare ***.

\* \* \*

(f) A home rule unit shall have the power subject to approval by referendum to adopt, alter, or repeal a form of government provided by law ***. A home rule municipality shall have the power to provide for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law. A home rule county shall have the power to provide for its officers, their manner of selection and terms of office in the manner set forth in Section 4 of this Article." Ill. Const. 1970, art. VII, secs. 6(a), (f).

A finding that the ordinance at issue effects a change in the "form of government," as indicated in the first sentence of section 6(f), would support the trial court's decision that approval by county-wide referendum is required and that the ordinance passed by defendants was therefore an unconstitutional enactment. A finding that the ordinance at issue does not change the form of government would negate the need for a county-wide referendum and lead to a reversal of the trial court's decision. A careful analysis of the pertinent constitutional provisions, the legislative history behind those provisions, and the applicable case law leads me to conclude that the latter alternative, upholding the constitutionality of the veto override ordinance, is the only valid one. It is for this reason that I respectfully dissent.

Resolution of the issue necessarily involves an inquiry into the intent of the drafters of the 1970 Illinois Constitution, who formulated sections 6(a) and 6(f) of article VII. This underlying intent is clearly set forth in the Report of the Committee on Local Government from the 1970 Constitutional Convention. The committee report, relied on in both the majority opinion and in *Pechous v. Slawko* (1976), 64 Ill. 2d 576, 357 N.E.2d 1144, which the majority finds to be controlling, sets forth the intent behind paragraph 4.3, the original version of section 6(f), in the following discussion:

"1. [Paragraph 4.3] *** empowers counties and municipalities

to adopt various differing forms of government \*\*\* and thereby implies that the General Assembly should provide alternative forms of government.

\* \* \*

3. [The] General Assembly [may] control the number of members of county boards and the manner of election, with the manner of election being subject to approval by county wide referendum \*\*\*. Paragraph 4.3 \*\*\* authoriz[es] counties, as units of local general government, to select for themselves one of various alternatives [sic] methods of election provided by the General Assembly under Section 6.

*But more than the manner of election of the county board is included within the meaning of 'form of government.' It also includes the relative powers and functions of the county board and the chief executive officer of the county.* Thus this paragraph contemplates that the General Assembly will provide for various patterns of county administrative organization—perhaps including the election of a county executive officer or the appointment of a county manager or administrative officer—and that counties will be permitted to select among these plans by referendum." (Emphasis added.)

It is on the interpretation of the italicized language, here the pivotal provision, that my colleagues and I differ. Relying on *Pechous,* my colleagues conclude that the drafters intended to include "the relative powers and functions of the county board and the chief executive officer" within the meaning of the term "form of government." Thus, the majority reasons that the veto override ordinance, an "attempt by the legislative branch to alter the relative powers possessed by the chief executive," defeats the drafters' intent and constitutes a change in the form of government.

I find no merit in their interpretation. It is clear to me that the italicized language refers to and characterizes the "various patterns of county administration" to be provided by the General Assembly and made available to counties and municipalities. The word "relative" refers to the relative balance of powers that distinguishes one of these various patterns from another, not to the "relative" shifting of power within a pattern. Until an internal shifting of relative powers within a pattern alters the existing external pattern of county administration government and transforms it to a different available alternative pattern, there has been no change in the form of government. A form of government is defined by the relative balance of powers within it. A mere shifting in the balance of powers will not automati-

cally transform one form of government into another form of government; or, viewed in another way, a shifting in the balance of powers within a form of government must constitute a redefinition and a change from one form to another to qualify as a change in the "form of government."

The majority, to find *Pechous* dispositive of the instant case, analogized the actions of the *Pechous* city council to those of the Cook County Board and concluded that the passage of the veto override ordinance here effected a similarly prohibited change in the "form of government." The inherent error in this conclusion is rooted in the falsity of the analogy itself, a falsity which readily reveals itself upon a closer examination of *Pechous*.

*Pechous*, unlike the instant case, involved a municipal form of government. When we look to the statutes to see what forms of government were provided for municipalities, we see that the statutes dealing with cities and villages (Ill. Rev. Stat. 1981, ch. 24, par. 1—1—1 *et seq.*) set forth three forms from which a city, village, or incorporated town may choose: the commission form (Ill. Rev. Stat. 1981, ch. 24, par. 4—1—1 *et seq.*), the managerial form (Ill. Rev. Stat. 1981, ch. 24, par. 5—1—1 *et seq.*), and the strong mayor form (Ill. Rev. Stat. 1981, ch. 24, par. 6—1—1 *et seq.*). Each of these statutory sections was drafted or amended after the effective date of the new constitution to provide these alternative forms of municipal government contemplated by the local government committee.

In the commission form, the council or commission possesses and exercises all executive, administrative, and legislative powers and duties. The managerial form, in contrast, specifies that the powers of the council or board are purely legislative, while executive powers are vested in the municipal manager. The manager has the statutorily authorized power to appoint and remove all directors of departments and to control all departments or divisions of the municipal government. Although a mayor or village president may be elected under this form, his powers are limited. A mayor of a nonaldermanic city or village does not have a veto power; a mayor in an aldermanic structure has very restricted voting powers; and under either structure a mayor has no power to appoint. Finally, in the strong mayor form, executive power to appoint and remove all administrative assistants, directors, department heads, and all other non-civil-service officers of the municipality, commissions, boards, and agencies is vested in the mayor, and all legislative powers in the council. In light of these distinctions, the majority's analogy of *Pechous* to the instant case is clearly baseless.

*Pechous* concerned a municipality that had chosen, from the various available forms, the managerial form of municipal government. Despite a clear statutory division of powers in which the removal and appointment power is exclusively granted to the municipal manager, the council enacted ordinances removing certain department heads and appointing their replacements. The *Pechous* court correctly noted that the council possessed no such authority under the managerial form of government. Moreover, the court found that the usurpation of this exclusive executive power amounted to a change in the form of government; the internal shift in power was of such magnitude that the external configuration was altered from the managerial form to the commission form, thereby requiring referendum approval. Here, unlike in *Pechous*, there has been no such change in form resulting from a usurpation of an exclusive executive power.

Having shown *Pechous* to be inapposite, we must till determine whether the defendants' action in the instant case constituted a change in the form of government. This determination requires a three-step analysis. First, we must determine what form of government or "pattern" of county administration is employed in Cook County. Second, we must examine the rationale underlying the existing form of government. Third, we must determine if the passage of the veto override ordinance so shifts the balance of power in the existing form of government as to alter the external pattern and change the existing form into one of the other alternative forms of county government. Only if the veto override ordinance does so may we properly find, as did the trial court, that the ordinance is unconstitutional. The result of this three-step analysis reveals, however, that such is not the case.

# I

As one of the explicit patterns by which a county could organize its government, the Illinois legislature, in the opening section of the County Executive Act (Ill. Rev. Stat. 1981, ch. 34, par. 701 *et seq.*), declared its intent to provide for the adoption of the county executive form of government. Section 3 of that act states,

"(c) 'County executive form of government' means that form of government in which the departments of county government are administered by a single county official called the county executive elected at large by the qualified voters of the county. The board shall act as the legislative body of the county under this form of county government." Ill. Rev. Stat. 1981, ch. 34, par. 703.

Cook County has a constitutionally established county executive form of government. (Ill. Const. 1970, art. VII, sec. 6(b).) Any county other than Cook may establish by referendum the county executive form of government for that county. The wording of the referendum, found in section 5 (Ill. Rev. Stat. 1981, ch. 34, par. 705), is of particular interest:

"Shall the county of . . . . . . become a Home Rule County and establish the county executive form of government?"

In other words, by electing a county executive at large, voters are simultaneously choosing the county executive form of government and home rule status for the county. The alternative forms of county government, *i.e.*, an executive elected out of the group of elected commissioners, or an executive appointed by the board, are available only to non-home-rule units. Cook County, by virtue of its mandated county executive form of government, is a home rule county and therefore has no alternative. The ordinance changing the veto override did not change Cook County from operating under a county executive form of government.

In addition to the county executive form of government, Cook County, because of its size and composition, has a unique two-district method of election for the Cook County Board. The Illinois Constitution of 1970 provides that the Cook County Board shall be elected from the city of Chicago and from the area outside Chicago. (Ill. Const. 1970, art. VII, sec. 3(c).) Under the 1870 constitution, the membership of the Cook County Board was fixed at 15 persons, "ten of whom shall be elected from the city of Chicago, and five from towns outside of said city ***." (Ill. Const. 1870, art. X, sec. 7.) A State statute was enacted to implement the 1870 Constitution. (See Ill. Rev. Stat. 1981, ch. 34, par. 901.) In 1983, the two-district method of election still stands.

However, since the adoption of the 1970 Constitution, the size of the County Board has increased from 15 to 17, with 10 commissioners elected from the city and seven from the suburbs. (See Ill. Const. 1970, Transition Schedule, sec. 5(b); see *Sutton v. Dunne* (1973), 365 F. Supp. 483.) Our supreme court, in *Allen v. County of Cook* (1976), 65 Ill. 2d 281, 357 N.E.2d 458, suggested that the two-district method of election and the number of members of the board to be elected from those districts constitute a "form of government" such that an ordinance that affected either aspect of county organization would constitute a change in the form of government. *Allen*'s suggestion that an alteration in the two-district method of election would change the form of government is consistent with the rationale underlying

the two-district concept, as will be discussed.

As a result of the above analysis, it is clear that the local government committee's statement that "form of government" included the "relative powers and functions of the county board and the chief executive officer of the county" referred to the patterns available and what powers were given to the executive and legislative branches under each pattern. Cook County, then, has a county executive form of government with a two-district method of election to the county board. This is the "pattern."

II

A State statute enacted in 1887 to implement the 1870 Constitution provides that in Cook County, four-fifths of all members of the board of commissioners must vote as a majority to override a presidential veto. (Ill. Rev. Stat. 1981, ch. 34, par. 908.) Two separate statutes pertaining to veto overrides have been enacted by the legislature, one that deals with Cook County and one that addresses counties other than Cook. (Ill. Rev. Stat. 1981, ch. 34, par. 701 et seq.; Ill. Rev. Stat. 1981, ch. 34, par. 901 et seq.) While the statute concerning Cook County provides for a four-fifths override requirement, the statute dealing with counties other than Cook requires only a three-fifths majority to override a presidential veto. As noted in the majority opinion, this four-fifths override requirement "appears to be one means by which the legislature set Cook County apart from other Counties." The opinion concludes that the four-fifths majority requirement is an "essential element" of the Cook County form of government, and therefore an alteration of that essential element would result in a change in the "form of government."

While the fact that the four-fifths majority requirement is unique to Cook County is undisputed, the distinction in and of itself is meaningless without examining the reasons that gave rise to it. An examination of the underlying rationale reveals that the four-fifths requirement is not an "essential element" of the form of government but merely a practical and unique solution to a problem unique to Cook County, a problem arising from the two-district method of election.

At the time of the passage of the State statute providing for a four-fifths majority, there were 15 members on the board of commissioners, 10 from the city and five from the suburbs. On any given proposition, 15 votes were cast. A three-fifths majority, or nine votes, would have enabled the 10 city commissioners consistently to override the vetoes of a president from the suburbs, totally excluding a suburban voice in an override vote. Thus, as the trial court noted, the "ob-

vious purpose'' of the four-fifths majority was to prevent one part of Cook County from dominating county government. The underlying rationale of the four-fifths majority is to insure that the second district (the area outside Chicago) will have a voice in overriding presidential vetoes. Because other counties do not have the unique two-district plan that Cook County has, there was never a need for these other counties to require a four-fifths majority. The three-fifths majority is the norm and is consistent with other laws and ordinances at the Federal, State, and local levels of government.

We noted, however, that Cook County has a "county executive form of government" in addition to the two-district method of election. Thus, we must also examine the rationale underlying the county executive form.

The legislature has made this an easy task by setting forth, by statute, the purpose behind this form of government:

"It is declared as a matter of legislative determination that *in order to promote the health, safety, morals and welfare of the public* it is necessary in the public interest to provide for an elected county executive form of county government in accordance with Sections 4(a) and 6(a) of Article VII of the 1970 Illinois Constitution." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 34, par. 702.)

This statutory determination makes clear the legislature's conclusion that the separation of powers inherent in the county executive form of government best insures the protection of the public welfare. This separation of powers has been preserved in the veto override ordinance.

### III

The instant case deals with an ordinance that impacts on both (1) the relative power between the city commissioners and the suburban commissioners, and (2) the relative power between the executive and legislative branches of county government. For this reason, the case at bar is not controlled by either *Allen,* which dealt with a shift of power within the legislative branch that did not affect the executive branch, or *Pechous,* which dealt with a usurpation of executive power by the legislative branch that changed the managerial form of municipal government. While neither of these cases is controlling, both are instructive on the issue at bar.

Having thus discerned the pattern or "form of government" in Cook County, as well as the rationale underlying that form of government, we must now determine if the veto override ordinance, by re-

ducing the required majority from four-fifths to three-fifths, undermines the rationale and/or alters the pattern of county administrative organization, thereby changing the "form of government" as conveyed in section 6(f) of article VII. ·

Under the override ordinance, 11 votes are required to override a presidential veto. As the board now stands, there are 10 city commissioners and seven suburban commissioners. Thus, neither the city bloc nor the suburban bloc alone has a sufficient number to override a veto. The city contingent must have at least one vote from the suburban contingent. Conversely, the suburban contingent, now requiring only an additional four rather than an additional seven city votes for a majority, has a stronger voice than it had under the old ordinance.

That the underlying rationale is preserved is further evidenced by the fact that the county board voted to enact the override ordinance by a vote of 14 yeas, two nays, and one absent. All of the suburban commissioners voted for the ordinance. It was President Dunne and two city commissioners, the parties plaintiff in the instant case, who did not support the ordinance. It is clear from this vote and from the identity of the parties in this action that the issue here is not trepidation of the dilution of the suburban voice but rather trepidation by the executive of dilution of his veto power.

As the veto ordinance now stands, the presidential veto power is substantially identical to that granted to the governor under the 1970 Constitution (Ill. Const. 1970, art. IV, sec. 9(c)), and to the county executive under the County Executive Act enacted to implement the county home rule provision of the 1970 Constitution (Ill. Rev. Stat. 1981, ch. 34, pars. 702, 710). His veto is greater than the simple majority provision permitted chairmen of county boards of counties under township form of government. (Ill. Rev. Stat. 1981, ch. 34, par. 855.) With a three-fifths or 60% requirement, the votes of eleven commissioners are needed to override a veto. Excluding the president, this means that 68.75% of the remaining 16 commissioners must vote to override the veto.

This change in the majority required to override the veto does not, therefore, remove President Dunne from the role of chief executive as he remains in the same position relative to his veto power as are all other chief executives.

The final step in the analysis is to determine if the veto override ordinance has the effect of changing the county executive form of government by somehow altering or destroying the purpose of that form. As explicitly set forth by the legislature, this purpose is to provide for the health, safety, morals and welfare of the public. (Ill. Rev.

Stat. 1981, ch. 34, par. 702.) It is not apparent how a reduction in the majority required to override a presidential veto endangers, in any way, the public health, safety, morals or welfare. It cannot be seriously contended that the Cook County Board of Commissioners, by requiring 11 votes to override a veto, would be in a better position to protect the public welfare.

We also note with interest that only a few years ago, in the case of *Winokur v. Rosewell* (1980), 83 Ill. 2d 92, 414 N.E.2d 724, President Dunne and the State's Attorney of Cook County expressly recognized the propriety of utilizing home rule powers to reduce the majority required to override the veto of the County Board president. In *Winokur*, one of the issues before the supreme court was the timeliness of Dunne's veto of a 1979 ordinance substantially identical to the one involved here, an ordinance that reduced the majority required to override a veto from four-fifths to three-fifths. Dunne, who had been joined as a defendant in his official capacity and was represented on appeal before the Illinois Supreme Court by the State's Attorney of Cook County, filed a brief containing the following statement:

> "The procedural ordinance in question would have reduced the majority necessary to override a veto from four-fifths to three-fifths. The *County Board clearly has the power to accomplish such a result under its home rule powers. Allen v. County of Cook* (1976), 65 Ill. 2d 281, 288 [357 N.E.2d 458]." (Emphasis added.) (Brief of appellee George W. Dunne in *Winokur v. Rosewell*, Supreme Court Docket No. 52862, at 31.)

Dunne's analysis in *Winokur* confirms that a neutral interpretation of the relevant case law and constitutional provisions properly sustains the override ordinance as a valid implementation of the home rule powers granted to the County Board.

CONCLUSION

The veto override ordinance, by reducing the majority needed to override a presidential veto from four-fifths to three-fifths, (1) does not change the two-district method of election or the number of commissioners elected, (2) does not defeat the rationale underlying the two district method of election, (3) does not change the county executive form of government, (4) retains the same checks and balances found sufficient to protect the separation of powers in all other examples of county executive form of government as well as in other forms of government at the Federal, State, and local levels, and (5) does not create an increased danger to the health, safety, morals or welfare of the public.

For these reasons, the veto override ordinance does not constitute a change in the "form of government" but rather falls under section 6(a) of article VII and is within the power of the home rule unit to perform any function pertaining to its government and affairs.

Having found that the enactment of the veto override ordinance did not constitute a change in the form of government, it necessarily follows that the council had the power to enact the ordinance without need of a county-wide referendum. The enactment of the ordinance is therefore constitutional.

In light of the apparent constitutionality of the veto override ordinance, I dissent.