THE PEOPLE *ex rel.* CARL R. HANSEN *et al.*, as Members of the Board of Commissioners of Cook County and as Taxpayers, Plaintiffs-Appellants, v. RICHARD J. PHELAN, as President and Member of the Board of Commissioners of Cook County, *et al.*, Defendants-Appellees.—JOHN H. STROGER, JR., as a Member of the Board of Commissioners of Cook County and as a Taxpayer, Intervenor and Plaintiff-Appellant, v. RICHARD J. PHELAN, as President and Member of the Board of Commissioners of Cook County, *et al.*, Defendants-Appellees.

First District (2nd Division)   Nos. 1—92—2915, 1—92—2931 cons.

Opinion filed March 16, 1993.

116

117

DiVITO, J., dissenting.

Holstein, Mack & Klein, of Chicago (Anthony B. Bass, Robert S. Kipnis, and Allyson Bouldon, of counsel), for appellant John H. Stroger, Jr.

Hoogendoorn, Talbot, Davids, Godfrey & Milligan (James A. Davids, David A. Shaneyfelt, and Bruce J. VanHeukelem, of counsel), and Morris, Rathnau & De LaRose (Joseph A. Morris, of counsel), both of Chicago, for other appellants.

Jack O'Malley, State's Attorney, of Chicago (Susan Getzendanner, Special Assistant State's Attorney, and Joseph L. Fogel, Kimberley K. Baer, and Martha J. Burns, of counsel), for appellees.

Roger Baldwin Foundation of A C L U, Inc., of Chicago (Colleen K. Connell and Dorothy Zimbrakos, of counsel), for *amici curiae.*

JUSTICE SCARIANO delivered the opinion of the court:
Plaintiffs appeal from the trial court's order denying their petition for a preliminary injunction and dissolving the temporary restraining order (TRO) it had previously entered. We affirm.

The facts in this case are almost entirely undisputed, as is evidenced by a stipulation in writing entered into by the parties. From 1973 to 1980, elective abortions were being regularly performed at Cook County Hospital when, on October 9, 1980, George W. Dunne, former president of the Cook County Board of Commissioners (the board), issued a directive (the directive or the Dunne directive) to the hospital's medical director ordering the immediate cessation of elective abortion services there, except those necessary to save the life of the woman. Upon issuance of Mr. Dunne's directive, those services at the hospital were immediately terminated. That same day, Mr. Dunne also issued a memorandum to the other members of the county board, with which he enclosed a copy of his directive to Cook County Hospital.

More than six weeks later, on November 24, 1980, Mr. Dunne made an oral motion before the board's public service committee that it "concur in his directive as to elective abortions at Cook County Hospital," and the motion was approved. On December 1, 1980, the board approved and adopted the report of the public service committee. The report was not in the form of an ordinance or a resolution, nor was it ever given an ordinance or resolution number. At no time during the period from October 9, 1980, to December 1, 1980, did the board adopt a written ordinance or resolution terminating elective abortion services at Cook County Hospital.

On June 18, 1992, defendant Richard Phelan, who by this time had succeeded Mr. Dunne as president of the Cook County Board of Commissioners, issued an executive order revoking and declaring Mr. Dunne's action which had terminated the voluntary interruption of pregnancy program at Cook County Hospital "a nullity," and directed the chief of health services to implement the restoration of elective abortion services there pursuant to the recommendations of a task force report. On July 28, 1992, plaintiffs, four members of the board, initiated this action against defendants seeking to enjoin implementation of President Phelan's executive order. Commissioner John H. Stroger was later granted leave to intervene as a party-plaintiff.

On July 29, 1992, Circuit Judge Richard Curry entered a temporary restraining order; but after a subsequent four-day evidentiary hearing, Circuit Judge Thomas J. O'Brien issued a memorandum of opinion and order denying plaintiffs' motion for preliminary injunction and dissolving the TRO. Plaintiffs filed a timely notice of interlocutory appeal pursuant to Supreme Court Rule 307(a)(1). 134 Ill. 2d R. 307(a)(1).

The issues on appeal are simply: did the board have a policy which prohibited President Phelan from resuming the performance of elective abortions at County Hospital, and, if not, did he have the authority to order their resumption?

In *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 524-25, 440 N.E.2d 117, 120, our supreme court, in defining the scope of our review when considering appeals from decisions rendered in preliminary injunction cases, stated as follows:

"The appellate court, in *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, summarized the role of the preliminary injunction and the nature of the review on appeal from an order issuing such an injunction when it stated:

'It is well established that a hearing on a motion for a preliminary injunction does not determine any factual issue. A preliminary injunction is issued to preserve the *status quo* until the trial court may consider the merits of the case. In ruling on a motion for such relief, controverted facts or the merits of the case *are not decided*. In reviewing the discretion exercised by the trial court, an appellate court may decide only whether the petitioner has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed; that the circumstances lead to a reasonable belief that they probably will be entitled to the relief sought, if the evidence sustains the allegations of the petition; and that matters should be kept in *status quo* until the case can be decided on its merits. In sum, the only question before us is whether there was a sufficient showing to sustain the order of the trial court. [Citation.]' *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 432-33." (Emphasis in original.)

Our supreme court then went on to say, however:

"In this case we do not feel limited by the traditional scope of review of an order issuing a preliminary injunction. Although the order in this case purports to be a preliminary injunction and many references are made in the order to the fact that the court is only preserving the *status quo* until there can be a hearing on the merits, this order is, in effect, a decision on the merits of the case. It should be noted that the transcript of the hearing on the motion for the preliminary injunction is in excess of 4,000 pages. Approximately 28 witnesses testified, and more than 80 exhibits were introduced. The hearing lasted ap-

proximately 15 days." *Dixon Association*, 91 Ill. 2d at 525, 440 N.E.2d at 120.

■ Similarly, in the case at bar, the report of proceedings on the motion for a preliminary injunction covers approximately 1,000 pages. The trial court heard from 11 witnesses over four days, considered 29 exhibits consisting of an additional 1,000 pages, the common law record consists of still another 1,000 pages, including numerous memoranda of law, and the parties also conducted a variety of discovery proceedings. Besides, as we have already noted, the parties entered into a detailed stipulation of facts which left very few others in dispute. Moreover, as the trial judge states in his memorandum opinion, "plaintiffs initially approached this case as a summary judgment matter. Two days before this hearing, plaintiffs intended to try the case on the merits as a declaratory judgment matter. Therefore, this cannot be characterized as a truncated record hurriedly assembled that will flower into a more convincing proof at a trial on the merits." At oral argument in this court, in response to a query from the bench, both sides were in accord that, as the supreme court did in *Dixon Association*, this court should consider the order of the trial court in this case to be, in effect, a decision on the merits of the case. Accordingly, the scope of our review will be so governed. (*Warrior v. Thompson* (1983), 96 Ill. 2d 1, 449 N.E.2d 53; *Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710, 717-18, 557 N.E.2d 506, *appeal denied* (1990), 133 Ill. 2d 572, 561 N.E.2d 706.) We are, therefore, bound to the standard of determining whether the trial court's findings are contrary to the manifest weight of the evidence and/or whether it has misconstrued or misapplied the pertinent law. *Dixon Association*, 91 Ill. 2d at 524-25, 440 N.E.2d at 120; *Preferred Meal Systems*, 199 Ill. App. 3d at 718, 557 N.E.2d at 511.

In ruling on plaintiffs' application for a preliminary injunction, the trial court held

"[t]hat the plaintiffs have failed to prove a likelihood of success since they have failed to prove by a preponderance of the evidence that the practice existing in October 1980 against elective abortions at Cook County Hospital was established as a result of a policy that the Cook County Board established as opposed to a mere directive by the then-president of the County Board. This in no way suggests that the County Board cannot choose to make it a policy now by proper legislative action."

Plaintiffs maintain that the trial judge abused his discretion in requiring them, in a preliminary injunction hearing with an underlying

*quo warranto* claim, to establish a likelihood of success on the merits. Defendants respond that the argument is "meritless as a matter of law," and that, moreover, plaintiffs acknowledged before and during the hearing that it was their burden to demonstrate a likelihood of success on the merits. In any event, they conclude, "because plaintiffs never raised the question concerning the allocation of the burden of proof with Judge O'Brien, any alleged error has been waived."

■ Plaintiffs' contention that the circuit judge "erroneously imposed the burdens of going forward and of proof upon the plaintiffs, rather than the defendants," can be dismissed, for after a careful review of the more than abundant testimony, the exhibits and the county board records that he had before him, the judge concluded that the evidence did not prove the existence of a prior board policy "as opposed to a mere directive by the then-president of the county board," and that in the absence of such a policy, the president had the authority to act. The judge also, as we have indicated above, discounted any likelihood that, at a subsequent trial on the merits, the record would be augmented or changed in any other way and that the outcome could therefore be any different.

Plaintiffs may reasonably disagree with the trial court as to whether or not its interpretation of the facts and its application of the law in this case were correct, but they cannot successfully dispute that the judge had all the evidence he needed, regardless of who presented it to him, in order to rule on those facts and the reasonable inferences he could draw therefrom. Indeed, the court's use of the "preponderance of the evidence" standard attests not only to its willingness but its very ability to make explicit findings and conclusions, indicating that it felt that it possessed all of the evidence necessary to render a fully informed decision on the merits without regard to the pedigree of that evidence. Nor do plaintiffs claim that they were not given ample opportunity to argue their view of the facts, the inferences that could be reasonably deduced from the evidence, and their interpretation of the law applicable thereto. More important, plaintiffs' argument that it is not their burden "to prove the non-existence of a legislative or policy vacuum; or that they or their predecessors acted with procedural regularity; or that they acted at all," is of no moment, for an examination of the official records of the county board clearly renders all three issues self-proving. Moreover, the trial court specifically found that the present board secretary and county clerk had "convincingly testified" not only to the contents of numerous official records, but "to the *absence* of evidence of Board action in the fall of 1980." (Emphasis in the original.) Furthermore, the parties

appear to have agreed in the trial court, as they do here, that this case turns almost entirely on the law. In any event, as defendants correctly point out, plaintiffs, having failed to raise the issue before the trial court, are assumed to have waived any alleged error. *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417, 420; *People ex rel. Universal Oil Products Co. v. Village of Lyons* (1948), 400 Ill. 82, 90, 79 N.E.2d 33, 38 (rule applicable in *quo warranto* actions); *Goldenberg v. Bazell* (1991), 219 Ill. App. 3d 672, 676-77, 579 N.E.2d 1077, 1080 (rule applicable to trial court's allocation of the burden of proof); accord *Browzin v. Catholic University of America* (D.C. Cir. 1975), 527 F.2d 843 (appellate court will not hear alleged error as to allocation of burden of proof if not raised in trial court).

During the period of March 19, 1973, to October 9, 1980, elective abortions were performed at Cook County Hospital under the guidelines of the hospital's voluntary interruption of pregnancy program,[1] but on October 9, 1980, as we have noted above, former County Board President Dunne ordered their immediate cessation except for those necessary to save the life of the woman. The trial court found that the Dunne directive was never formally submitted to the county board for any action. Also on October 9, 1980, Mr. Dunne sent a memorandum to all of the other county commissioners which in its entirety states as follows:

> "I have sent a copy of [State's Attorney Carey's letter of opinion] to Cook County Hospital to comply with the law which restricts abortions to save the mother's life. It is not against the law to perform abortions which are paid for. With the shortage of nurses at the hospital, we should not have a staff of nurses for that purpose when we are experiencing problems in the intensive care areas because of the nurse shortage. The hospital should not be an abortion mill."

The first time that Mr. Dunne's directive appears on any agenda is for the November 24, 1980, meeting of the board's public service committee, at which time he appeared and described the actions "he had taken" with respect to abortions at Cook County Hospital, and he orally requested the committee "to concur in the conduct that I took,

---

[1] In answer to an inquiry from the court at oral argument, plaintiffs' counsel answered that it is not known by what authority elective abortions were performed at the hospital during this period. From 1969 to 1979, however, the hospital was not under the control of the county board, as we discuss below.

and I so move." The committee agreed to concur in Mr. Dunne's directive, after which the meeting adjourned.

On December 1, 1980, the public service committee met again and transmitted its report to the board regarding the action taken on the Dunne directive, which report shows only that the committee had concurred in his prior action. The board's official journal of proceedings for the meeting of December 1, 1980, shows merely that it approved and adopted the report of the public service committee, but here the evidence is conflicting as to whether the report of the committee was in writing at the time that it was approved by the board. Although defendants made an exhaustive search of the pertinent records, they were unable to discover any evidence that the board ever adopted a written ordinance, resolution, or motion regarding elective abortions at Cook County Hospital. See Ill. Rev. Stat. 1991, ch. 34, par. 2–6008.

From October 9, 1980, the date of Mr. Dunne's directive, until his retirement in 1990, abortions for reasons other than a threat to the life of the woman were performed rarely at Cook County Hospital. During that period, Mr. Dunne, by telephonic instructions to the hospital, authorized abortions himself in cases of fetal anomalies or threats to the life of the woman; subsequently, however, the hospital's internal medical guidelines, developed to be consistent with Mr. Dunne's directive and with his acquiescence, allowed abortions in the following instances: life or health of the woman, fetal indications, and rape and incest.

On June 18, 1992, Mr. Phelan issued executive order 92–1, asserting that

> "[t]he action of the former president and the concurrence of the board in regard to that action are not binding on the current president. No president of the board may bind his successor by informal executive action, and no board may bind a board president by action not taken in accordance with the statutes of the State of Illinois."

Accordingly, Mr. Phelan revoked and declared Mr. Dunne's action which had terminated the voluntary interruption of pregnancy program at Cook County Hospital "a nullity," and directed the hospital to resume elective abortion services there. The executive order concludes with the statement that it "shall remain in full force and effect unless and until superseded by a duly adopted and lawful ordinance of the Cook County Board of Commissioners."

The board had adopted an ordinance in 1991 which provides for, among other things, the consolidation of various health care services into a bureau of health services. Section 3 of that ordinance provides:

"The Chief of Health Services shall be the chief executive officer of the Bureau of Health Services and shall be responsible for the management and direction of the Bureau of Health Services and of any other agency, function or matter that the county board or president may assign from time to time. The Chief of Health Services shall be under the direction and the control of the president and subject to policy as set by the county board." Cook County Ordinance 91—0—52 §3 (1991).

Because the ordinance did not define the term "policy" and because the trial court could not find, "nor has it been cited any judicial interpretation of the word 'policy' as it applies to governmental bodies," it resorted to the definition contained in Black's Law Dictionary.

Judge O'Brien's memorandum opinion went on to hold that since it was undisputed that the board had not promulgated any policy on elective abortions, it had, by legislative inaction, conceded that it was not a policy matter and that, therefore, executive order 92—1 could implement elective abortions at Cook County Hospital—"subject, of course, to the County Board's right to adopt a policy against" them.

Judge O'Brien based his decision on section 2—6008 of the Counties Code (Ill. Rev. Stat. 1991, ch. 34, par. 2—6008), which provides in part:

"All ordinances, resolutions or motions shall be submitted to said board of commissioners in writing, or reduced to writing before any vote shall be taken thereon; and if adopted by the board, the same shall not take effect until after the same shall have been approved in writing by the president of said board ***[.]"

and also, on Rule 22 of the Rules of Procedure of the Cook County Board, which requires that all new business originate with the board and that it be introduced in writing by a commissioner or the president.

The court held that neither section 2—6008 nor board Rule 22 had been complied with, and that the testimony of Mr. Dunne and Commissioners Stroger and Hansen, called by plaintiffs,

"[was] not of sufficient weight to overcome the presumptive accuracy of the official records ***. '[W]here officials *** are required to keep a record of proceedings of their offices, the record constitutes the only lawful evidence of action taken and

cannot be contradicted, added to, or supplemented by parol.' *People ex rel. Toman v. Chicago Heights Terminal Transportation R.R. Co.* (1941), 375 Ill. 590, 597, [32 N.E.2d 161, 165], citing *People [ex rel. Wangelin] v. City of St. Louis* [1937], 367 Ill. 57[, 10 N.E.2d 369]."

The court also found that the testimony regarding other

"actions taken in the fall of 1980 support an intent to approve President Dunne's directive as opposed to expressing County Board policy. The events that occurred at the Public Health Committee meeting on November 24, 1980, disclosed in the transcript, indicate the Commissioners expressing approval of *President Dunne's action already* taken at County Hospital.

President Dunne himself asked the committee, 'to concur in the conduct that I took, and I so move.' There is no evidence of a written motion and, in any event, the occasion was not that of a board meeting, but a committee meeting.

\*\*\*

Plaintiffs' proof that in October 1980 the medical staff at Cook County Hospital implemented a policy of no elective abortions is not necessarily evidence that it was done as a result of the board adopting such a policy. On the contrary, the evidence would suggest otherwise. The medical staff ceased its prior policy upon the direction of President Dunne, before any involvement by the county board.

\*\*\*

Nor does the evidence show that the implementation of elective abortions at Cook County Hospital would require the hiring of additional medical staff and thus the appropriation of additional funds to cover the anticipated additional procedures. Therefore, the action of the president, in the absence of a county board policy, would not amount to appropriating county funds." (Emphasis in original.)

■ The stipulation of the parties is that "at no time from and including October 9, 1980, to and including December 1, 1980, did the Cook County Board adopt a written ordinance or resolution terminating elective abortion services at Cook County Hospital." Plaintiffs maintain, however, that when one of the commissioners "moved that the report of the committee on public service be adopted," during the county board's December 1, 1980, meeting, this satisfied the "written motion" requirement of section 2—6008. Plaintiffs' argument, however, is blunted by the fact that the record shows an absence of evidence that this "motion" itself was submitted to the board in writing

or reduced to writing before any vote was taken on it by the board as required by section 2—6008. Plaintiffs simply failed to overcome what the trial court found to be defendants' satisfactory proof of an absence of evidence of "proper legislative action" in the fall of 1980. We note in this connection that the court, although not required to admit plaintiffs' parol evidence on this issue (*People ex rel. Toman*, 375 Ill. at 597, 32 N.E.2d at 165), did so, and yet, even after contemplating it, the judge still made the disputed finding.

Plaintiffs further contend that because the public service committee was a committee of the whole, and the committee held a public hearing, the approval and adoption of the committee report by the board constituted a binding county board policy. Plaintiffs overlook, however, that the evidence as to whether the report had been reduced to writing at the time the board approved it, as required by section 2—6008, was conflicting at best. The issue before the trial court at that point, then, became one of credibility of the witnesses, and it is hornbook law, requiring no citation of authority, that on such an issue we do not substitute our judgment for that of the trial judge. Furthermore, Commissioner Hansen himself, one of the plaintiffs in this case, testified that it was possible that the report was not in writing when it was approved by the board, and he was in attendance at the meeting at which the approval was had; thus, as defendants appropriately suggest, this would seem to lend greater support to the trial judge's conclusion.

■ But even if the committee report were in writing as of the December 1, 1980, board meeting, it would, as the trial court held, reflect nothing more than a memorialization of the board's approval of the committee's "concurrence" in Mr. Dunne's directive. To suggest that the approval of the minutes of a meeting or a committee report can be substituted for the statutorily mandated ordinance, resolution or motion would require either that all such minutes or reports be available to the president for his signature or veto, or that the board can make law in circumvention of the century-old, truly unique, and inviolate veto power of the president (*Dunne v. County of Cook* (1984), 123 Ill. App. 3d 468, 462 N.E.2d 970, *aff'd* (1985), 108 Ill. 2d 161, 483 N.E.2d 13), either of which procedures would be incontestably beyond the contemplation of section 2—6008. We agree with the trial judge's conclusion that the board's concurrence in the Dunne directive was not a legislative act of any sort, especially when one considers that the act of legislating could not have been either foreign or esoteric to a body that in 1980 alone processed approximately 200 ordinances and resolutions into final measures.

■ Plaintiffs claim for the first time on appeal that the trial court erred as a matter of law in failing to recognize that the journal of proceedings of December 1, 1980, "clearly establishes that the Board adopted as its own the policy adopted by its committee on public service," and that this official record cannot be "explained, enlarged or contradicted by parol evidence." Defendants respond that they find this argument a bit curious in light of the fact that during the hearing in the trial court, much of plaintiffs' case was directed at attacking the board's official records with parol evidence. We, too, find this engaging ambidexterity somewhat quaint, that, as defendants argue, "having now concluded that the December 1, 1980 journal of proceedings is the only official record from which they seek comfort, plaintiffs ask this court to invoke the parol evidence rule to shield *that* document alone from attack." But the parol evidence cases plaintiffs cite do not countenance that a party should be able to choose which documents can or cannot be the subject of oral testimony. In fact, those cases hold only that unambiguous official records are presumptively valid. Plaintiffs' assertion that the December 1, 1980, journal is "accurate" avails us nothing in light of the fact that that document does not reflect that the board passed a written ordinance, resolution or motion, but recites merely that it approved and adopted the report of the public service committee.

In any event, this argument, not having been made to the trial court, as defendants urge, is waived. *Harrington v. Kay* (1985), 136 Ill. App. 3d 561, 565, 483 N.E.2d 560, 564 (right to assert contention on appeal that precontract conversation should have been banned under parol evidence rule was waived since party failed to object to testimony at trial).

■ Plaintiffs next argue that Mr. Dunne's direction to the hospital to terminate elective abortion services was not a unilateral act of executive authority, and that he could not have terminated elective abortions at Cook County Hospital without board action. The record, however, as defendants respond, refutes that conclusion, for, as the record plainly shows, and as plaintiffs concede, immediately upon the issuance of Mr. Dunne's directive, women who had been waiting at the hospital for their procedures were sent home, and those who were scheduled for the procedures in the immediate future had their appointments canceled.

As noted above, the trial court's memorandum opinion makes it clear that after carefully considering all the testimony as well as the official board records in making its decision, it concluded:

"The testimon[y] of [Mr.] Dunne, [and Commissioners] Stroger and Hansen, although genuinely trying to the best of their memories to relate the actions taken by the President and County Board in the fall of 1980, [was] not of sufficient weight to overcome the presumptive accuracy of the official records. [Present County Board Secretary] Kreloff and [present County Clerk] Orr, methodically referring to numerous official records, convincingly testified to their contents and more importantly, to the *absence* of evidence of Board action in the fall of 1980. [Emphasis is the court's]. '[W]here officials *** are required to keep a record of proceedings of their offices, the record constitutes the only lawful evidence of action taken and cannot be contradicted, added to, or supplemented by parol.' *People ex rel. Toman v. Chicago Heights Terminal Transportation R.R. Co.* (1941), 375 Ill. 590, 597, [32 N.E.2d 161, 165,] citing *People [ex rel. Wangelin] v. City of St. Louis* [1937], 367 Ill. 57, [10 N.E.2d 369]."

The court further held that the board also violated its own Rule 22, which requires that all new business originate with the board through a written submission by the president or a commissioner. As the unchallenged official records show, Mr. Dunne formally transmitted only two communications to the board (from medical school staff and students protesting his directive), and, significantly, neither included his directive. Plaintiffs claim, however, that the "Board's failure to comply with the rules is, and ought to be, of no consequence," and that because "no one was in doubt as to the substance of the matter under consideration," the board met the requisite "indicium of conscious policy making." The issue before the circuit court, however, as defendants aptly point out, was not a challenge to the validity of an official board "act"; rather, the issue was whether the board ever officially "acted." Thus, the trial judge looked to the board's noncompliance with Rule 22 not as a basis to invalidate any official action taken by the board, but to determine, instead, whether plaintiffs could demonstrate that the board in 1980 was engaged in a policy-making process at all.

Plaintiffs' citation of cases standing for a "general rule" that "an act cannot be declared invalid for failure of a body to observe its own rules," is, as defendants point out, inapposite for the simple reason that they address the suspension of rules in the face of formal policy making, which, as we have just noted, did not occur here. To uphold the plaintiffs on this point would mean that the board could, for example, suspend its rule calling for written ordinances and legislate by

an oral motion—an intolerably procrustean result. Moreover, Rule 22 is not merely an internal rule; it is a home rule ordinance, as are all board rules, having the force of law, and therefore the board was obligated to observe it. Although Rule 23 permits the rules to be suspended upon a two-thirds vote, Judge O'Brien found that there had been no formal waiver, a finding we hold to comport with the manifest weight of the evidence.

But even if the board could ignore its own rules, plaintiffs cite no authority for the proposition that the board can ignore a State statute, namely, section 2—6008 of the Counties Code. (Ill. Rev. Stat. 1991, ch. 34, par. 2—6008.) On the contrary, Illinois is clear as to the proposition that where the law-making process is delineated by a superior law which mandates compliance with certain procedural requirements prior to the passage of a legislative proposal, anything done by the legislative body which does not strictly adhere to the prescribed method is a nullity and therefore has no legal effect. *Treadway v. City of Rockford* (1962), 24 Ill. 2d 488, 496, 182 N.E.2d 219, 224 (in which the supreme court felt impelled to disabuse a trial court of its mistaken belief that a municipality's failure to comply with statutorily prescribed procedural steps for the enactment of an ordinance is immaterial to a subsequent determination of the validity of that procedurally deficient ordinance); *People ex rel. Smith v. Wabash Ry. Co.* (1941), 377 Ill. 68, 75, 35 N.E.2d 325, 329 (ordinance not valid because no record of legal passage); *People ex rel. Blachly v. Coffin* (1917), 279 Ill. 401, 117 N.E. 85 (holding that a legislative act is to be considered passed only when it has gone through all the necessary procedures), *overruled on other grounds People ex rel. Durante v. Burdett* (1918), 283 Ill. 124, 118 N.E. 1009; *Village of Mettawa v. Carruthers* (1988), 175 Ill. App. 3d 772, 775, 530 N.E.2d 537, 539 (ordinance not valid since the record of its passage did not meet statutory requirements); *Village of Bourbonnais v. Herbert* (1967), 86 Ill. App. 2d 367, 373, 229 N.E.2d 574, 578 (ordinance unenforceable because explicit statutory requirements for passage of ordinance not followed).

We are comforted by the fact that only five commissioners formally avow adherence to the theory that the approval and adoption of a committee report by the board constitutes binding county board policy; if that contention happens to be shared by the remaining 11 commissioners who are not parties to this action, we grieve for the legislative process in Cook County. As Judge Cooley long ago noted:

"[N]ot only is it important that the will of the law-maker be clearly expressed, but it is also essential that it be expressed in

due form of law; since nothing becomes law simply and solely because men who possess the legislative power will that it shall be, unless they express their determination to that effect, in the mode pointed out by the instrument which invests them with the power, and under all forms which the instrument has rendered essential." Thomas M. Cooley, A Treatise on Constitutional Limitations 155 (6th ed. 1890).

Nor do plaintiffs contend that the board was in a rule-making mode when it adopted and approved the report of the public service committee on December 1, 1980. No matter; for the procedure to adopt a rule is no different than that which must be followed in making policy. Besides, plaintiffs' entire focus in the trial court, as well as here, has been on *policy* because of the "magnitude," which is but one of the many superlatives by which they persistently characterize the decision made by President Phelan, thus urging throughout this proceeding that "policy" is much more exalted than either a board rule or regulation. To uphold plaintiffs in their contention that the mere adoption or approval by the county board of a report of one of its committees constitutes proper law making is to invite all legislative bodies ultimately to follow the method employed by the Emperor Caligula who, legend has it, promulgated the law by writing it in small characters and placing it on the highest pillar in Rome, the better to entrap his subjects. Nor should the people of Cook County be required to decipher palimpsests in order to ascertain the existence of board ordinances, resolutions or motions.

Accordingly, we hold that the trial judge was correct as a matter of law when he held that the board must meet the requirements laid down by the pertinent statutes and ordinances when engaged in decision making, for we are furnished no authority that in order to discover the legislative enactments of the Cook County Board of Commissioners those who are interested are obliged to look for them in the form of "approved and adopted" committee reports. But even then the search would be futile in this case because there is simply nothing in the record to show that a member of the public would be able to obtain from either the county clerk's office or the county hospital the policy plaintiffs claim to have been enacted in this case. Indeed, there is testimony in the record by the former board secretary that the board, like all legislative bodies, employed bond counsel to see to it that the board met all of the required procedural steps whenever it undertook to pass an ordinance or resolution to issue bonds. It takes no expert to predict the legal fate of a bond issue that had to depend on the "passage" of an enactment that proceeded no further

in the legislative process than the board's "adoption and approval" of a committee report. Yet the passage of viable policies, rules or regulations depends upon the same faithful observance of procedural regularity required in the case of bond issue resolutions or ordinances.

■ Plaintiffs next assert that because Judge O'Brien's opinion does not specifically reject their argument that executive order 92–1 constitutes a change in the form of Cook County government, he failed to consider it. We have previously rejected that precise argument in *Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 959, 466 N.E.2d 977, 992 (dismissing explicitly the argument that "if the trial court did not discuss [it] in its memorandum opinion *** it must have failed to consider that issue"); consequently, we accord plaintiffs' assertion no greater reception here.

Plaintiffs claim that executive order 92–1 changes the form of Cook County government because it allows the president to deviate from the status quo by initiating a new program which then puts the burden upon the board to pass an ordinance if the board disagrees with the president's actions. The president could then veto any proposed ordinance, the argument continues, thereby requiring the board to muster a four-fifths vote to override the veto. According to plaintiffs, the president and three other commissioners could effectively implement county board policy, thereby unconstitutionally changing the form of government in Cook County. Defendants respond that plaintiffs' argument ignores the fact that *whenever* the board acts, the board president always has the power expressly granted to him by the legislature to veto the board's action. Ill. Rev. Stat. 1991, ch. 34, par. 2–6008.

Surely, any president, under the current system of Cook County government, would be capable of causing much more mischief than that presented in the spectre raised by plaintiffs, simply by the perversive wielding of his veto power with regard to appropriations measures alone, which would be more than enough to hold any board measure, or even its opposition to one of his, hostage to his intransigence. And he can be just as perverse in the exercise of his right to hire and fire every county employee who does not report directly to another elected county official, including the personal staff of the other commissioners, however key or confidential they may be (*Dunne v. County of Cook* (1987), 164 Ill. App. 3d 929, 518 N.E.2d 380, *appeal denied sub nom. Dunne v. Bowen* (1988), 119 Ill. 2d 556, 522 N.E.2d 1243); yet none of these prospects changes the form of county government—it *is* the form of county government. In such cases the president might be said to be acting arbitrarily, capriciously or unreason-

ably (for which the law provides its own remedy), but in no sense of the term could it be said that he would be changing the form of government of Cook County. More important, as we shall discuss more fully in a subsequent portion of this opinion, the board, as the trial court held, in enacting the health services ordinance, delegated to President Phelan the authority to restore elective abortions at County Hospital. The four-fifths veto override requirement of which plaintiffs complain, therefore, is not a change in the current form of government, it *is* the current form of Cook County government and has been such since 1887.

While the statutory four-fifths veto override provision may place the president at a strategic advantage over the board, the legislative scheme must be parsed, as the trial court recognized, precisely as it was enacted by the General Assembly, for the source of the authority of both the president and the board in this case must come from those enactments; and we discern no room therein for any concern the courts might have as to which party is advantaged, whether by the nimbleness of one, or the insouciance, the veto-phobia, or the sheer timidity of the other. Plaintiffs' complaint is not an issue to take up with the courts, but with the General Assembly, that branch of our State government that has, as is nearly always the case, the larger type and the last word. "Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts." (*Crooks v. Harrelson* (1930), 282 U.S. 55, 60, 75 L. Ed. 156, 175, 51 S. Ct. 49, 51.) Moreover, marshaling the four-fifths vote necessary to override a board president's veto has not proved to be the insuperable obstacle plaintiffs would have us believe, for in *Dunne v. County of Cook* (1987), 164 Ill. App. 3d 929, 518 N.E.2d 380, and *Dunne v. County of Cook* (1984), 123 Ill. App. 3d 468, 462 N.E.2d 970, all three vetoes forming the subject matter of those cases were easily overridden by the board.

In oral argument before this court counsel for plaintiffs for the first time in this case claimed that President Phelan's action changes also "the mission of the hospital, meaning a shift away from the provision of *necessary* medical services to any kind of *elective* medical service. It is *elective* medical services that are at issue here." (Emphasis added.) Counsel for defendants responded not only that she had "never heard that argument before" and that "there was no evidence as to the mission of the hospital" but that, on the contrary, the chief of health services had testified that the hospital "routinely per-

forms *elective* surgery. There is no mission there about only performing *necessary* surgery." (Emphasis added.) Because the record does not support plaintiffs in this regard and because the argument is made for the first time on appeal, we dismiss it out of hand.

Plaintiffs next claim that because the county board in 1979 assumed control over the hospitals from the former governing commission, which was not a legislative body, the board does not have to comply with section 2—6008 when it takes action with respect to Cook County's hospitals. Plaintiffs further assert that because the governing commission law as well as the other statutes by which the board governs the hospitals of Cook County refer only to the board and not to the county board president, section 2—6008, which provides for the presidential veto of proposed board action, does not apply with respect to the board's governance of the county's hospitals. Defendants reply that "the statutory history of the control of the county hospitals makes it clear that the county board must comply with section 2—6008." We agree.

■■ Prior to 1969, the Cook County Board had direct jurisdiction over Cook County's public hospitals—Cook County Hospital and Oak Forest Hospital. The provisions of section 2—6008 of the Counties Code were also in effect in 1969. (Ill. Rev. Stat. 1969, ch. 34, par. 908.) From 1969 to 1979, the General Assembly placed the responsibility for "organizing, operating, maintaining and managing the various hospitals, *** medical, nursing, health and allied medical *** programs related [thereto]," in the comprehensive County Hospitals, Health and Allied Medical Programs Governing Commission ("the governing commission"). (Ill. Rev. Stat. 1971, ch. 34, par. 5020 (now repealed).) When, in 1979, the legislature abolished the governing commission, returning responsibility for the hospitals to the county board (Ill. Rev. Stat. 1981, ch. 34, par. 5020), the General Assembly did not provide any different procedure which the board must follow in order to legislate. Indeed, the legislature's 1979 transfer of the "rights, duties and obligations" of the governing commission to the county board did not "transform" the board; it simply gave back to the board, as the debates on the bill disclose, what it took away in 1969, nothing more. (86th Ill. Gen. Assem., Senate Proceedings, November 7, 1979, at 100-51; 86th Ill. Gen. Assem., Senate Proceedings, November 8, 1979, at 15-24.) Nothing in the 1979 enactment either expressly or impliedly provides that when the board acts with regard to the Cook County hospitals it may do so without meeting the requirements of section 2—6008. The board votes on written ordinances, resolutions or motions, and the board president signs or vetoes them

or permits them to become law without his signature. Upon the president's signature or a veto override, or by his sheer inaction for the requisite period of time, they become law. That was the law in 1979 (Ill. Rev. Stat. 1979, ch. 34, par. 908), and that is the law now (Ill. Rev. Stat. 1991, ch. 34, par. 2—6008).

▮▮ Plaintiffs maintain that because the 1979 act speaks only of the "board," the president of the county board has no role whatsoever in governing the county hospitals. Yet, as defendants assert, the portions of the 1979 statute that speak only of the "board" are not unique. Throughout the Counties Code, the statutes identify the county board as the governing body for Cook County, and assign a wide variety of responsibilities to the board. For example, section 5—1004 provides that "[t]he powers of the County as a body corporate or politic, shall be exercised by a county board, to wit: *** in the County of Cook, by a board of county commissioners." (Ill. Rev. Stat. 1991, ch. 34, par. 5—1004; see also Ill. Rev. Stat. 1991, ch. 34, par. 2—6009.) The county board president, however, is also a member of the county board and, therefore, entitled to vote as a member even when the board votes to override his veto. (Ill. Rev. Stat. 1991, ch. 34, pars. 2—3007, 2—6002, 2—6007, 2—6008.) As defendants point out, none of those provisions purports to dispense with the overarching requirements as to how the Cook County Board acts as provided in section 2—6008 of the Counties Code. The General Assembly has thus made it clear that section 2—6008 controls. There is no other statutory procedure as to how the board acts.

▮▮ In oral argument before this court plaintiffs' counsel suggested that when the county board makes policy for the hospital, it sits "not *qua* county board, but in the special capacity as the board of directors of the governing commission of the hospitals." We do not find that gloss anywhere. Moreover, we note that the board's journal of proceedings for December 1, 1980, shows that it was the county board that sat and not any special board of directors; nor was the 1979 transfer to any board but the county board. (Ill. Rev. Stat. 1991, ch. 34, par. 5—37003.) We note also that the "Cook County Hospital Corporate Bylaws" were adopted by the board *qua* County Board and not by the board sitting in "the special capacity as the board of directors of the governing commission of the hospitals," an entity, as the legislative history clearly shows, that was abolished in 1979. Ill. Rev. Stat. 1991, ch. 34, par. 5—37003.

▮▮ We therefore hold that the trial court's finding that the 1980 board failed to evince an *intent* to create binding board policy in an already exercised act of executive authority is not against the mani-

fest weight of the evidence. Plaintiffs' unsupported assertion, that the fact that "[the board] spoke clearly is proved by the fact that hospital personnel ceased providing such services for more than a decade," was specifically rejected by the trial judge, who found that this was a practice predicated on Mr. Dunne's directive, and not upon a board policy. The judge further found that after Mr. Phelan had become president, no expansion of the voluntary interruption of pregnancy program was considered until March of 1992, when he directed the county board secretary to determine whether there was any existing board policy that would prevent the restoration of elective abortions at Cook County Hospital. This followed the hospital's reaccreditation in February 1992.[2] Since July 29, 1992, elective abortions were proscribed solely by the TRO entered by Judge Curry. The only consistent theme, running like a *leitmotif* throughout the entire record in this case, is that the actions of the *executive* have *always* controlled the nature and extent of the abortion program at Cook County Hospital.

■■ Citing general principles of equity such as constructive trusts and reformation from cases, as defendants assert, having nothing to do with the process by which binding county enactments are to be made, plaintiff-intervenor asserts that the trial court erred in refusing to overlook the patent deficiencies in the 1980 county board's actions and that this court should invoke its equitable powers "to create the formality needed." Defendants respond that plaintiff-intervenor's contention is meritless and that his reliance on cited authorities is groundless.

In *Cesena v. Du Page County* (1991), 145 Ill. 2d 32, 582 N.E.2d 177, *cert. denied sub nom. Fawell v. Cesena* (1992), 504 U.S. 915, 118 L. Ed. 2d 556, 112 S. Ct. 1953, cited by plaintiff-intervenor, an attorney sought to file a statutory hit-and-run report on behalf of a client with the Du Page County sheriff within three hours of the acci-

---

[2]We agree with the defendants' contention that the fact that on March 5, 1991, two commissioners filed a proposed ordinance to require expanded abortion services at Cook County Hospital offers no insight into the existence or nonexistence of a prior board policy prohibiting abortions; nor for that matter, does it offer any insight into the power of the president to implement an abortion services program at Cook County Hospital without prior Board approval. Significantly, plaintiffs offer no authority for the proposition that the mere introduction of a proposed ordinance, resolution or motion is to be taken as an indication of what the nonsponsoring members' view is as to whether or not a certain policy does or does not exist or that the president has or has not the power to implement a program at Cook County Hospital without prior Board approval.

dent as specifically required by the applicable statute. The sheriff's deputy, however, impeded the attorney's effort to comply with the statute by refusing to accept the report and sending the attorney to the State police. The court invoked its equitable jurisdiction and ruled that the report was deemed filed as of the date and time that the attorney attempted to file it with the sheriff. Plaintiff-intervenor fails to explain how this case has any application to the facts of this case, where the board completely failed to follow the procedures for proper law making. As Illinois courts have held, those requirements cannot be ignored. (*People ex rel. Blachly v. Coffin*, 279 Ill. 401, 117 N.E. 85; *People ex rel. Smith v. Wabash Ry. Co.*, 377 Ill. at 75, 35 N.E.2d at 329 (ordinance invalid because no record of legal passage); *Village of Mettawa*, 175 Ill. App. 3d at 775, 530 N.E.2d at 539 (statutory requirements not met so ordinance invalid); *Village of Bourbonnais*, 86 Ill. App. 2d at 373, 229 N.E.2d at 578 (ordinance unenforceable because explicit statutory requirements for passage not followed).) No one whose position is analogous to that of the sheriff's deputy in *Cesena* rendered the 1980 board's compliance with section 2—6008 impossible. Indeed, as we have noted above, the 1980 board knew how to make binding law when it intended to do so.

As the trial court held, the provisions of the health services ordinance clearly delegate to the president "direction and control" over the chief of health services, who is also director of Cook County Hospital, "subject to policy as set by the county board." Having found no contrary policy, the circuit court further held that President Phelan was free to "implement elective abortions" at the hospital. Plaintiffs contend, however, that the ordinance empowers the president to act merely as the "implementing conduit between board policy and the chief of health services." We cannot agree with such an exceedingly narrow view.

As indicated earlier in this opinion, the trial judge noted that the term "policy" is not defined, either by State statute, county ordinance, or otherwise. Significantly, however, by virtue of the bylaws pertaining to County Hospital adopted by the county board on March 10, 1987, the board has authority as follows:

> "(e) To develop *overall policies* for the operation of the hospital.

> (d) [*sic*] To make, amend, and repeal *rules and regulations governing the hospital* or its educational programs *or any of its activities as to medical practices*, organizations, *service*, choice of staff personnel, *acceptability, admission or exclusion of* physicians or surgeons or *patients, acceptability of cases*, recep-

tion, *exclusion* and discharge *of all patients,* and the *general internal government of the hospital,* its educational programs *or other activities."* (Emphasis added.)

For some impenetrably obscure reason, the term "overall policies" is not defined or clarified in the board's hospital bylaws, but, curiously, the term "rules and regulations" is made to cover such a broad range of subjects that it becomes all the more difficult for us to understand the frightful cacophony that went on in the trial court over the term "policy," a fuss that continues unabated here. Even the most cursory examination of these bylaws leads ineluctably to the conclusion that "overall policies" must necessarily encompass matters different from and, according to plaintiffs, more important than, those embraced by "rules and regulations," the scope of which is comprehensively defined by the board. We are therefore led irresistibly to the conclusion that if the board were to act at all with reference to the performance of elective abortions at County Hospital, logic would require it to do so within the ambit of "rules and regulations" rather than by invoking its authority to enact "overall policies," a term completely lacking in definition.

Furthermore, although the chief of health services is, according to the provisions of the health services ordinance, "under the direction and control of the president and subject to policy as set by the county board" (Cook County Ordinance 91—0—52 §2 (1991)), "policy" is not only undefined, but the very act of President Phelan which precipitated the bringing of this action is, by the county board's definition of the subject matter that comes within the purview of "rules and regulations," *not* a *policy* matter at all—all of which lends further support to the trial court's holding, if, indeed, additional support is needed, that President Phelan was not encroaching on the board's universally conceded power to make *policy,* a function plaintiffs have exalted as too important to be left to the county's chief executive officer. Consequently, *policy* and *rules* and *regulations* are relevant to the issues in this case only to the extent that there is a total absence thereof as they relate to abortions. The issue nevertheless remains as to whether President Phelan had authority to order the resumption of abortions at County Hospital in light of the absence of *any* interdictory pronouncement of the board, whether by policy or rule or regulation or otherwise.

Our State constitution creates the office of president of the Cook County Board of Commissioners and provides that he "shall be the chief executive officer of the County." (Ill. Const. 1970, art. VII, §4(b).) In addition, the president derives his powers from the Illinois

Constitution, statutes, Cook County ordinances, the common law or historical precedent unless altered by law or county ordinance. (Ill. Const. 1970, art. VII, §4(d).) Even before we adopted our 1970 State constitution, it was clear beyond dispute that "[t]he position of president of the Cook County Board of Commissioners is quite different from that of chairman of the county board in other counties. Whereas the latter is little more than a presiding officer, the position of Cook County president is much stronger ***." C. Snider & I. Howards, County Government in Illinois 67 (1960).

Mr. Phelan was elected as president of the board by the voters of Cook County at large (Ill. Const. 1970, art. VII, §4(b); Ill. Rev. Stat. 1991, ch. 34, par. 2—6002), and he was also elected as a commissioner by the voters residing in that part of Cook County lying outside of Chicago. (Ill. Const. 1970, art. VII, §4(b); Ill. Rev. Stat. 1991, ch. 34, par. 2—6002; Cook County Ordinance ch. 4, §4—7 (1980).) He can vote as a member of the board, and although he does not have a casting vote upon any question upon which he has voted as commissioner, he is entitled to vote on the issue of overriding his veto. (Ill. Rev. Stat. 1991, ch. 34, par. 2—6007.) Section 2—6008 of the Counties Code permits the Cook County Board president to veto any ordinance, resolution, or motion passed by the board, and it requires the vote of four-fifths of the members elected to the board to override his veto. Ill. Rev. Stat. 1991, ch. 34, par. 2—6008; see also *Dunne*, 123 Ill. App. 3d 468, 462 N.E.2d 970.

In the case of counties under township organization, the veto of the chairman of the board can be overridden by only a majority of the members of the board. (Ill. Rev. Stat. 1991, ch. 34, par. 2—1005.) In counties not under township organization, the chairman is elected by the members of the board, and he has no veto power. (Ill. Rev. Stat. 1991, ch. 34, par. 2—4003.) Under the county executive form of government, the county executive is not an elected member of the county board (Ill. Rev. Stat. 1991, ch. 34, par. 2—5008), and his veto authority is subject to a three-fifths vote of the members of the board to override. Ill. Rev. Stat. 1991, ch. 34, par. 2—5010.

The president of the Cook County Board has the authority to veto appropriations measures not only in their entirety, but on a line item basis as well. (Ill. Rev. Stat. 1991, ch. 34, par. 2—6008.) He also has the authority to hire, supervise and fire members of the personal staffs of the other commissioners, however key or confidential they may be (*Dunne*, 164 Ill. App. 3d 929, 518 N.E.2d 380), and of the staff of the board as a whole; and he appoints, with the approval of the board, the chief of the bureau of health services and the director

of the Cook County Hospital, both of whom serve at his pleasure. Cook County Ordinance 91—0—52, §2 (1991).

The constitution of Illinois makes the president of the Cook County Board the chief executive officer of the county, in the words of constitutional convention delegate Phillip Carey, *in order to "strengthen[ ] his position considerably* because if he is chief executive merely by statute, then the General Assembly can change it." (Emphasis added.) 4 Record of Proceedings, Sixth Illinois Constitutional Convention 3230.

The trial judge concluded that President Phelan's power to implement executive order 92—1[3] derives from the express provisions of the Health Services Ordinance, adopted on October 7, 1991, which provides for the consolidation of Cook County health care services into a central Bureau of Health Services. Section 3 of that ordinance provides:

> "The chief of Health Services shall be the chief executive officer of the Bureau of Health Services and shall be responsible for the management and direction of the Bureau of Health Services and of any other agency, function or matter the county board or president may assign from time to time. The chief of Health Services shall be under the direction and the control of the president and subject to policy as set by the county board." Cook County Ordinance 91—0—52, §3 (1991).

Plaintiffs' entire argument that President Phelan was without authority to order the resumption of elective abortions at County Hospital is based on his alleged inability to act even if we were to assume, *arguendo,* the absence of a board policy authorizing such action. Since the parties agree with the trial court that it is the ordinance that determines whether or not President Phelan has such authority, it would be appropriate to turn our attention to that enactment.

It is noteworthy that although the health services ordinance puts the chief of health services "under the direction and the control of the

---

[3]We fail to appreciate the parties' jousting over President Phelan's use of the term "Executive Order." It matters not what he denominates his directions to county employees, whatever their status; instead, we deem only the substance of those directions to be important. After all, President Dunne's order to cease the performance of elective abortions at County Hospital in 1980 was in the form of a letter to the medical director of the hospital, who experienced no difficulty in carrying out its mandate immediately.

president and subject to policy as set by the county board,"[4] no mention is made of either official being subject to "rules and regulations" in connection with the management and direction of the bureau and therefore the hospital. Nor are we referred to any rules or regulations promulgated by the board that might be pertinent to this issue. It is further worthy of note that although, as we have indicated above, the reference in the board's hospital bylaws is to "overall policies," nowhere are we given any intimation as to the meaning of either "policy" or "overall policies," or to the difference in meaning between the two, let alone the difference between "overall policies" and "rules and regulations." We are therefore not only without a policy, but we are bereft of any applicable rule or regulation as well.

The Illinois Supreme Court has had occasion recently to reiterate what it has long and consistently held with respect to statutory interpretation:

"In the absence of statutory definitions indicating a different legislative intent, words in a statute are to be given their 'ordinary and popularly understood meaning.' [Citations.] To ascertain the ordinary and popular meaning of words, this court has in the past used the dictionary as a resource. [Citations.]" (*People ex rel. Daley v. Datacom Systems Corp.* (1991), 146 Ill. 2d 1, 15, 585 N.E.2d 51, 57.)

Accordingly, the supreme court, as did the trial court in this case, and, as we do here, resorted to Black's Law Dictionary for guidance.

We are nowhere treated to a definition of the terms "management," "direction," and "control," as used in the health services ordinance. Black's Law Dictionary, however, defines "management" as "[g]overnment, control, superintendence, *** act of managing by direction or regulation, or administration, as management of *** great enterprises, or of great affairs. *** Discretionary power of direction." (Black's Law Dictionary 865 (5th ed. 1979).) "Direction" is defined as "[t]he act of governing; management; superintendence" (Black's Law Dictionary 414 (5th ed. 1979)); and "control" is defined as "[p]ower or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee" (Black's Law Dictionary 298 (5th ed. 1979)).

We cannot assume that the board, in enacting the health services ordinance, delegated to its chief of health services the *"management and direction"* of County Hospital, and *"any other *** function or*

---

[4]Although it can be argued that this clause subjects only the chief of health services to policy and not the president, we disregard what might be jumbled syntax, as the parties and the trial judge have done throughout this proceeding.

*matter the \*\*\* president may assign from time"*; and that it delegated the *"direction and control"* of the chief of health services to the president as naked authority only, in light of the import of the terms with which such authority is clothed by the ordinance; for, it goes without saying, a substantial degree of discretion not only may, but, for government to function, often must, be left to those charged with carrying out the law. Plaintiffs, although acknowledging that such discretion may be delegated, insist that no such delegation has occurred here. We stoutly disagree.

We find it impossible to sustain plaintiffs' contention that a constitutional officer who is made the chief executive of his *county*, representing some 5½ million constituents; who has been granted a statutory veto power unequalled, so far as we have been apprised, anywhere else in national, State or local government; and who has the power to hire and fire even the personal staff employees of the other board members, however "key or confidential" they may be, is made nothing by the board's ordinance, as plaintiffs would have it, but "the implementing conduit between board *policy* [whatever that means] and the chief of health services." Plaintiffs may seek to reduce the status of these two highly important officials to that of a transmitter and a recipient of messages and until that happens they are to do nothing but shuffle papers or sit on their hands, but the board cannot be said to share that sentiment.

The action of the board in promulgating its health services ordinance in such broadly stated terms does not permit such a proscriptive interpretation, especially when one ponders the definition of the terms selected by the board itself in its delegation of authority to the chief of health services and the president in the operation of County Hospital. This is more especially so when one considers, and the record is quite clear on this point, that President Phelan and the chief of health services, in the relatively short span of time that Mr. Phelan has been chief executive officer of the county, have made a host of management decisions including the initiation or the termination of a variety of medical programs relating to the operation of all of the hospitals in Cook County without having to seek the approval of the board, absent an independent reason for obtaining such approval, such as accreditation or funding requirements. Nor has the activity of the president in this regard been by any means unprecedented, for Judge O'Brien found that at least one similar management decision, the one claimed by plaintiffs to enjoy policy status in this case, was made by former President Dunne acting alone. Indeed, the record clearly establishes that certain elective abortions continued to

be performed at County Hospital well after the Dunne directive purported to abolish them and well after the board is alleged to have "adopted" the directive as "policy," at first on order of Mr. Dunne acting alone and later by a hospital committee formed with Mr. Dunne's acquiescence. Nowhere in this record are we given a single instance of the board's having to set policy before President Phelan could act as to hospital matters.

It must also be kept in mind that when he ordered the resumption of elective abortions at Cook County Hospital for women who could not afford them, President Phelan was not directing the performance of any procedure that was illegal, or against public policy, or that was unsafe, expensive, or unethical in the view of the medical profession. The issue of whether the County Hospital should implement the program recommended by the task force report was decided, as the trial court found, in the same way that other decisions regarding new hospital programs and medical practices were made, that is, by the director of the hospital in consultation with the president. More important is the stark fact, gleaned from the record in this case, that plaintiffs concede that the president may act on all matters but abortion. However, our research fails to disclose a single statute, ordinance or case that places controversial matters off limits to the president. Indeed, the record in this case shows otherwise, and the trial court so found. If the avowal of the parties themselves and the acknowledgement of the trial court are to have any validity, *i.e.*, that this case is not about abortion, then there cannot be anything special about abortion that would require it to be treated as different from any other medical practice.

We can perceive of no reason, and plaintiffs offer no persuasive one, as to why the county board should not be deemed to have delegated to its chief of health services and its president, as much authority as it believed necessary or appropriate to execute any of its powers regarding Cook County Hospital. (See *Lake County Board of Review v. Property Tax Appeal Board* (1988), 119 Ill. 2d 419, 428, 519 N.E.2d 459, 463 ("[A]dminstrative officers may validly exercise discretion to accomplish in detail what is legislatively authorized in general terms"); *Townsend v. Gash* (1915), 267 Ill. 578, 584, 108 N.E. 744, 746 ("An express grant of power or duty to do a particular thing includes the express grant of power to do all that is reasonably necessary to execute that power or duty").) The board may wish to exercise its authority in a particular field, but because the field is suffi-

ciently technical, the ground to be covered sufficiently large,[5] and the members of the board themselves not necessarily expert in the area in which they choose to legislate, the most that may be asked under the separation of powers doctrine is that the board promulgate such enactments as would enable its executive to animate, as the board expressed it in its health services ordinance, the *management, direction* and *control* of the agency it put under his aegis. The hermetic sealing off sought by plaintiffs here, of the board from its executive, could easily frustrate the operations of a county government capable of effectively exercising the substantive powers granted to both by our State constitution and our Counties Code. Although the board itself is not among the complaining parties in this case, it hardly needs this court to instruct it that it is not without the means by which it can directly overturn any executive action it may find unacceptable after such action is taken by its chief executive officer: it may amend the executive's enabling enactment to contract his power or it may overturn the specific executive action it deems objectionable. As we have indicated earlier in this opinion, it is no answer for plaintiffs to complain of whatever strategic advantage there may be in an executive's use of his veto; such an argument reflects a profoundly different conception of the separation of powers doctrine from that held by the courts which not only sanctioned, but helped to usher in, the modern administrative state.

Plaintiffs' final contention is that Judge O'Brien erred in concluding that implementation of executive order 92—1 will not require appropriation or expenditure of county funds in excess of $10,000 without prior board approval. (Ill. Rev. Stat. 1991, ch. 34, par. 2—6010 (providing that the amount of $2,500 may not be exceeded, but this amount was increased by the board, under its home rule power, to $10,000. See Cook County Ordinance ch. 10, §10—17 (1980).) Defendants respond that by improperly attributing the accounting concept of "cost" to the statutory terms "appropriation" and "expenditure," plaintiffs misconstrue the reach of the relevant ordinance. Plaintiffs

---

[5]The record shows that Cook County Hospital is a 920-bed, in-patient facility; that it has an on-site clinic which treats over a half million out-patients per year; that it has 6,300 employees; that it has the most important trauma unit in the Chicago area which services some 5,000 trauma victims per year; that the hospital's emergency room services over 180,000 visits annually; and that it "fills more out-patient prescriptions in any given day than twenty-six" of Chicago's largest pharmacies. Oak Forest Hospital, a long-term care facility, also managed by the Bureau of Health Services, has over 1,000 beds and operates three satellite south suburban clinics. The bureau also operates Provident Hospital and the Cook County Department of Health.

further argue that because implementation of executive order 92—1 could "cost" in excess of $1 million on an annual basis, its current implementation will run afoul of the "expenditure of public funds" provisions of section 2—6010 of the Counties Code. (Ill. Rev. Stat. 1991, ch. 34, par. 2—6010; Cook County Ordinance ch. 10, §10—17 (1980).) Defendants reply that the uncontroverted testimony before Judge O'Brien amply demonstrated that under the relevant law no further board approval of expenditures or appropriations is required for the hospital to proceed with implementation of executive order 92—1. We agree.

The uncontroverted testimony referred to by defendants is that offered by H. Woods Bowman, chief financial officer of Cook County, who testified that Cook County ordinance 73—0—8, now section 10—17 of the Cook County ordinances (Cook County Ordinance ch. 10, §10—17 (1980)), makes clear that if the hospital already has in its inventory any supplies that would be necessary to perform such procedures as elective abortions, no board action would be required before the use of those supplies could be made, and that if the hospital had the personnel necessary to perform elective abortions and had the necessary equipment, no further board action would be necessary before the personnel could be deployed and the equipment used for elective abortion procedures. Summarizing his review of the task force report, Mr. Bowman testified that implementation of elective abortions at Cook County Hospital would not require additional appropriations at the present time, nor would such implementation require additional expenditures.

██ Based upon this uncontradicted evidence, the trial judge correctly concluded that implementation of elective abortion services at Cook County Hospital "would not amount to appropriating County funds." The judge was also correct in ruling that implementation of executive order 92—1 will not at the present time require any additional "expenditure" or "appropriation" of county funds not already approved by the board. The board is not without power to change matters in future budgets and appropriations if enough of the remainder of its members are of a like mind as plaintiffs.

In sum, we cannot say that the trial court's findings of fact are contrary to the manifest weight of the evidence, nor can we hold that its conclusions of law are in error. We therefore affirm the circuit court's judgment that there being no interdictory pronouncement by the board to prohibit it, President Phelan had the necessary authority, clearly delegated to him by the board, to "direct and control" the

chief of health services in implementing the restoration of elective abortion services at Cook County Hospital.

Affirmed.

O'CONNOR, J., concurs.

JUSTICE DiVITO, dissenting:
This is a case about the separation of powers between the executive and legislative branches of Cook County government. The sole question presented is whether the president of the Board of Commissioners of Cook County has authority to unilaterally reinstate a program of elective abortions at Cook County Hospital. The answer is no.

I

As the majority holds, and the parties agree, the circuit court's order denying preliminary injunctive relief followed a full hearing and was effectively a decision on the merits. Moreover, the issue presented is one of interpretation of a legislative enactment, a question of law, on which we need not defer to the circuit court's ruling. (*Monahan v. Village of Hinsdale* (1991), 210 Ill. App. 3d 985, 993, 569 N.E.2d 1182, 1188.) Accordingly, this court may decide the merits of plaintiffs' *quo warranto* action. (*Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 525, 440 N.E.2d 117, 120.) A brief introduction to the applicable analytical framework therefore follows.

*Quo warranto* is " '[a]n extraordinary proceeding, prerogative in nature, addressed to preventing a continued exercise of authority unlawfully asserted.' " (*Department of Illinois Disabled American Veterans v. Bialczak* (1976), 38 Ill. App. 3d 848, 850, 349 N.E.2d 897, 899, quoting Black's Law Dictionary 1417 (4th ed. 1951); Ill. Rev. Stat. 1991, ch. 110, par. 18—101 *et seq.*) To commence such an action, a plaintiff need merely allege generally that a defendant has exercised a claimed right without authority in law; the defendant then has the burden of proving the legal justification for the challenged act. (*People ex rel. Daley v. Datacom Systems Corp.* (1991), 146 Ill. 2d 1, 36, 40, 585 N.E.2d 51, 67, 68.) *Quo warranto* defendants therefore must demonstrate affirmatively that the law provides the requisite authority; they cannot prevail merely if no law precludes their conduct. (*Datacom*, 146 Ill. 2d at 38, 585 N.E.2d at 68 (dismissal of *quo warranto* complaint reversed because ordinances cited by the defendants did not supply authority even though nothing precluded the defendants' act).)

Thus, here defendants have the burden of proving that the law authorizes defendant Phelan (the President) to reintroduce the voluntary interruption of pregnancy program (the Program) at the Cook County Hospital (the Hospital).

## II

To meet this burden, defendants begin with the Illinois Constitution's provision creating the office of the president, which states that "[t]he President of the Cook County Board *** shall be the chief executive officer of the County." (Ill. Const. 1970, art. VII, §4(b).) This position, defendants insist, carries powers identical to those granted to chief executive officers of all counties but Cook under section 2—5009 of the County Executive Law (Ill. Rev. Stat. 1991, ch. 34, par. 2—5009), including the power to issue executive orders. That no comparable statutory grant of powers exists for the Cook County President does not trouble defendants. They claim that such legislation was unnecessary because the purpose of the statute was to allow counties other than Cook to adopt the form of government Cook County already had under the State constitution, which would include the powers enumerated in the County Executive Law.

Defendants' explanation fails to persuade. They overlook another constitutional provision, which permits all counties, not just Cook, to have a chief executive form of government (Ill. Const. 1970, art. VII, §4(a)), and they ignore the express provision in the statute confining its effect to counties other than Cook. Furthermore, even if this statute could be said to define the powers of Cook County's chief executive, the provision defendants cite as support refers to the authority to issue executive orders for "coordinat[ion] and direct[ion of] *** all administrative and management functions of the county government" (Ill. Rev. Stat. 1991, ch. 34, par. 2—5009(b)). As explained below, the subject matter of the President's executive order does not fall within this category. More importantly, as the majority correctly observes, it is not the form of the President's action but rather its substance that is at issue.

For the scope of the President's powers, one must look first to the Illinois Constitution rather than to the County Executive Law. All county officers, in Cook and other counties alike, "shall have those duties, powers and functions provided by law and those provided by county ordinance" as well as those "derived from common law or historical precedent unless altered by law or county ordinance." (Ill. Const. 1970, art. VII, §4(d).) In Hospital matters, the General Assembly transferred to the Board of Commissioners (the Board), the

powers, rights, and duties of the former governing commission, which include the power "to organize, operate, maintain and manage insofar as developing and enforcing broad policies," "to establish and enforce policies regarding [Hospital] use, operation and management," and "to establish rules and regulations for the use, operation and management thereof." (Ill. Rev. Stat. 1991, ch. 34, par. 5—37003, incorporating Ill. Rev. Stat. 1971, ch. 34, par. 5020 (repealed).) The statute makes no mention of the President; the same is true of the Hospital's bylaws. Thus, by statute, only the Board has authority over the Hospital.

In 1991, however, the Board enacted the health services ordinance (the Ordinance). It established the Bureau of Health Services (the Bureau), which includes the Hospital. The Ordinance states that

"[t]he Chief of Health Services shall be the chief executive officer of the Bureau of Health Services and shall be responsible for the management and direction of the Bureau of Health Services and of any other agency, function or matter the County Board or President may assign from time to time. The Chief of Health Services shall be under the direction and the control of the President and subject to policy as set by the County Board." (Cook County Ordinance No. 91—0—52, §3 (1991).)

Whatever powers common law or historical precedent may have vested in the President, from the date of its passage onward the Ordinance altered that authority with regard to the Hospital.

Although the majority faults the Board for not defining the word "policy" in the Ordinance or in the Hospital's bylaws, this is a commonplace occurrence; indeed, the same is true of the statute giving the Board the governing commission's role. In such circumstances a court simply looks first to the ordinary and popularly understood meaning of an enactment's undefined words when it begins its task of ascertaining and giving effect to the legislative intent. (*Datacom*, 146 Ill. 2d at 14-15, 585 N.E.2d at 57.) The circuit court correctly determined that the Board's intent when enacting the Ordinance was to vest in itself the power to decide Bureau policy, but it (and the majority) wandered astray at the next analytical step: they reason that in the absence of a definition of the word "policy" in the Ordinance, the Board's current inaction must be interpreted as its concession that reinstatement of the Program cannot be a "policy" matter unless the Board votes on it. In their view, anything is a policy matter once the Board votes on it, and nothing is a policy matter unless the Board votes on it. In other words, apparently, a decision as inconsequential as the length of the custodian's coffee break would be transformed

into a policy matter for the purposes of the Ordinance if the Board chose to vote on it, but a decision as significant as replacing the existing Hospital buildings would not unless and until the Board voted on it.

This construction of the Ordinance is plainly wrong. It fabricates from whole cloth an interpretation of the phrases "management and direction," "direction and control," and "subject to policy as set by the Board" far removed from their ordinary and popularly understood meanings. The ordinary meaning of the word "policy," for which the circuit court consulted Black's Law Dictionary, is the "general principles by which a government is guided in its management of public affairs" or, when applied to a law, its "general purpose or tendency considered as directed to the welfare or prosperity of the state or community." (Black's Law Dictionary 1157 (6th ed. 1990).) A review of other dictionaries unearths nothing different. Using this definition along with those the majority gives for "management," "direction," and "control," the plain meaning of the Ordinance is that the Board delegated to the chief executive officer of the Bureau its statutory authority to oversee and administer the Hospital's day-to-day affairs subject to the President's approval, and that the Board retained its power to guide the Bureau's chief executive officer with expressions of the general principles and purposes of the Bureau.

A court may not, as the majority does by holding that the Ordinance permits the President to set policy in the face of Board inaction, "insert words into [a] legislative enactment[ ] when [it] otherwise presents a cogent and justifiable legislative scheme." (*Waste Management of Illinois, Inc. v. Illinois Pollution Control Board* (1991), 145 Ill. 2d 345, 348, 585 N.E.2d 606, 607.) The language of the Ordinance, which delegates to the President the power to "direct and control" the Bureau's chief executive officer, implies absolutely no legislative intent to grant the President *carte blanche* in policy matters whenever its decision-making process lacks sufficient alacrity to suit the President, just as here, for example, when a resolution to expand abortion services at the Hospital has languished in committee for two years. Rather than construing the Ordinance according to its plain meaning, the majority interprets the Ordinance in contravention of that meaning, for it makes the Bureau's chief executive officer "subject to policy as set by the [*President*]" unless and until the Board changes it. This reading makes the Board superfluous and the words "subject to policy as set by the Board" mere surplusage.

Defendants also assert that to interpret the Ordinance to preclude the President from initiating action in Hospital policy matters that

the Board has not yet addressed "contradicts the practical realities of managing the affairs of major health institutions" and "is inconsistent with any common-sense notion of a 'chief executive officer.'" At oral argument, they insisted that such an interpretation would "hamstring" county government. The majority finds this argument persuasive.

Although the Ordinance may have created an unwieldy regime for managing the Hospital, this court may not hazard an opinion as to its wisdom, for when considering an unambiguous legislative enactment, a court may only interpret the legislature's intent and must uphold that intent unless the result would be absurd. (*Buckellew v. Board of Education of Georgetown-Ridge Farm Community Unit School District No. 4* (1991), 215 Ill. App. 3d 506, 511, 575 N.E.2d 556, 559, *appeal denied* (1991), 142 Ill. 2d 652, 584 N.E.2d 127 (undesirability of result does not permit court to depart from law's plain meaning).) Should defendants fear that the division of authority established by the Ordinance is impractical, their recourse lies with the Board, which can amend the Ordinance, or with the General Assembly. Until then, just as by statute the President cannot initiate action in appropriations matters, so too does the Ordinance bar him from doing so in Hospital policy.

Moreover, the "hamstringing" deplored by defendants and the majority is simply the natural consequence when a legislature has the right to act first and the executive has the power to block its actions by veto. For example, as demonstrated by last year's budget stalemate in California, when a legislature enacts an appropriations measure and its executive vetoes it, the result is that nothing happens until either the two branches reach an agreement or the legislature overrides the veto; the executive cannot step into the breach. In the majority's view, though, the President not only has the power to veto the Board's policy initiatives for the Hospital, he also has the authority to set new policy and to change the status quo, so long as he has the agreement of just a few like-minded commissioners to block any attempt to override his veto.

This is not, contrary to the majority's reasoning, the way Cook County government works. As extraordinary as the President's veto power is, it is only the power to prevent the Board from acting, not the power to act in its stead. To hold that the President may step in to fill a "vacuum" left by Board inaction in effect requires the Board to "veto" the President when the two branches disagree, thereby enhancing the power of the latter at the expense of the former. Such alterations in the balance of power between the President and the

Board, which constitute a change in Cook County's form of government, require a county-wide referendum. (*Dunne v. County of Cook* (1985), 108 Ill. 2d 161, 483 N.E.2d 13 (referendum required to change veto override requirement because doing so alters the relative powers of the President and the Board); *Dunne v. County of Cook* (1987), 164 Ill. App. 3d 929, 518 N.E.2d 380 (resolution to allow Board to hire own staff not permitted because it would change relative powers), *appeal denied sub nom. Dunne v. Bowen* (1988), 119 Ill. 2d 556, 522 N.E.2d 1243.) For these reasons, I cannot agree with the majority's interpretation of the Ordinance as granting the President the authority to set policy for the Bureau in the face of Board inaction. Instead, the Ordinance makes plain that the Board has delegated to the President the power to initiate action only in matters that fall outside the general principles by which the Bureau should be guided in its activities.

## III

Even though the President has no power to initiate Hospital policy or to change the status quo in Hospital policy matters, he would have the authority to reinstate the Program if to do so falls within the scope of his authority to "direct and control" the Bureau's chief executive officer. Defendants assert, and the majority appears to agree, that deciding to offer elective abortions is analogous to deciding to provide out-patient services at Oak Forest Hospital, which formerly was only a geriatric and rehabilitation hospital; to develop referral and ambulatory care networks with other medical institutions; to dedicate two floors of Provident Hospital to alternative birthing facilities; to authorize the Hospital to perform its first liver transplant; to expand the mammography program; and to establish tuberculosis and AIDS programs. Because these decisions were neither submitted to nor challenged by the Board, they reason, the decision to reinstate the Program likewise must be within the President's aegis.

The analogy fails. Every one of these decisions merely involves the management, administration, and allocation of medically necessary services, the essence of the Hospital's day-to-day affairs. By contrast, the decision to use county funds for elective medical procedures, reimbursement for which in this instance is prohibited by State and Federal law, implicates the general principles and purposes of the Bureau. These include which medical services the county will provide with its scarce resources, given that by ordinance, admissions to the Hospital are restricted, "insofar as practicable, to persons with respect to whom the County of Cook is obligated by law or by contract

to furnish *necessary hospital care and treatment*" (emphasis added) (Cook County Ordinance §22—1 (1980)). As the United States Supreme Court has commented in another context:

> "*The decision whether to expend [public] funds for nontherapeutic abortion is fraught with judgments of policy and value* over which opinions are sharply divided. \*\*\* *[W]hen an issue involves policy choices as sensitive as those implicated by public funding of nontherapeutic abortions, the appropriate forum for their resolution in a democracy is the legislature.* We should not forget that 'legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.' " (Emphasis added.) (*Maher v. Roe* (1977), 432 U.S. 464, 479-80, 53 L. Ed. 2d 484, 498, 97 S. Ct. 2376, 2385-86, quoting *Missouri, Kansas, & Texas Ry. Co. v. May* (1904), 194 U.S. 267, 270, 48 L. Ed. 971, 973, 24 S. Ct. 638, 639 (upholding State ban on payment for elective abortions but allowing payment for childbirth expenses).)

It comes as no surprise, therefore, that in Federal and State government, legislative decisions to use or not to use public funds for elective abortions are legion. (See Corns, *The Impact of Public Abortion Funding Decisions on Indigent Women: A Proposal to Reform State Statutory & Constitutional Abortion Funding Provisions*, 24 U. Mich. J.L. Ref. 371, 380-81 (1991), citing generally NARAL Found./ NARAL, *Who Decides? A State-by-State Review of Abortion Rights 1991* (1991), and specifically, in addition to the Federal Hyde Amendment, which is applicable in the District of Columbia (District of Columbia Appropriations Act 1991, Pub. L. No. 101—518, 104 Stat. 2224, 2235): Ariz. Rev. Stat. Ann. §35—196.02 (1990); Idaho Code §56—209c (Supp. 1990); Ill. Rev. Stat. 1989, ch. 23, par. 6—1; Ind. Code §16—10—3—3 (Supp. 1990); Ky. Rev. Stat. Ann. §§205.560(1), (6) (Baldwin 1991); La. Rev. Stat. Ann. §40:1299.35 (West 1990); 1990 Md. Laws 1460-61 (ch. 409, line item 32.17.01.03); Mass. Gen. L. Ann., ch. 29, §20B (Law. Co-op. 1988); Mich. Comp. Laws Ann. §400.109a (West 1988); Minn. Stat. Ann. §256B.062516 (West Supp. 1991); Mo. Rev. Stat. §208.152.1(14) (Vernon 1986); N.J. Stat. Ann. §30:4D—6.1 (West 1981); N.Y. Soc. Serv. Law §365—a(2) (McKinney 1983 & Supp. 1991); N.D. Cent. Code §14—02.3—01 (Michie 1981); Ohio Rev. Code Ann. §5101.55(C) (Baldwin 1989); Okla. Stat., tit. 56, §206(C) (Supp. 1990); Pa. Stat. Ann. tit. 62, §453 (Supp. 1990); R.I. Gen. Laws §23—13—18(c) (1989); S.D. Codified Laws Ann. §28—6— 4.5; Utah Code Ann. §26—18—10(6) (1989); Va. Code §§32.1—92.1, 32.1—92.2 (Michie 1985); Wis. Stat. §§20.927, 59.07(136), 66.04(1)(m)

(West 1988); Wyo. Stat. §35—6—117 (1988); see also 1992 Iowa Adv. Legis. Serv. S.F. 2392; 1992 Kan. Sess. Laws 183.)[6] In some States, a constitutional provision on this issue governs. (Ark. Const. amend. 68, §1; Colo. Const. art. V, §50.) That this is so reflects an acknowledgement that the decision to expend public funds for elective abortions is among those better addressed by the legislative process of public deliberation and comment than by executive fiat. Elective abortions, of course, do not present the only such policy decision; a similar question would arise if, for example, the procedure at issue were elective reconstructive surgery or sex-change operations.[7]

Some of these statutes prohibit all abortions except under certain circumstances, such as rape, incest, or to save the life of the woman; implication, public funding of abortions would be similarly limited.

In sum, the decision to provide elective medical procedures, including elective abortions, at the Hospital is a policy matter for the purposes of the Ordinance. Therefore, I cannot agree with the majority that reinstatement of the Program is within the President's authority under the Ordinance.

IV

The Ordinance defines the relative powers of the Board and the President from 1991 onward, so the origin of the 12-year ban on elective abortions at the Hospital is of little consequence to the question before this court, which is whether the Ordinance gives the President the power to reinstate the Program in 1992. Because the majority devotes much of its opinion to this point, however, I offer the following observations.

Defendants' challenge to the pedigree of the ban is the functional equivalent of a *quo warranto* action of their own against Dunne's authority to issue the directive, challenging his power to decide to end the Program absent the Board's formal approval. Even assuming that

---

[6]Some of these statutes prohibit all abortions except under certain circumstances, such as rape, incest, or to save the life of the woman; by implication, public funding of abortions would be similarly limited.

[7]Contrary to an assertion by defendants' counsel at oral argument that Rothstein testified that the Hospital routinely performs elective surgical procedures, no such statement appears in Rothstein's testimony. Interestingly, however, from her testimony it appears that the Board has ordered the Hospital not to perform sex-change operations.

defendants have standing to contest Dunne's authority,[8] their challenge is simply untimely, as intervenor Stroger suggests. (*People v. City of LeRoy* (1920), 293 Ill. 278, 127 N.E. 695 (challenge rejected because no benefit from voiding improper annexation and universal acquiescence over more than ten years).) Here, from 1980 until 1992, there has been universal acquiescence in the ban against elective abortions at the Hospital. In addition, each subsequent board of commissioners relied on the validity of the ban when approving appropriations, and taxpayers have relied on it as well. To allow a challenge now would prejudice the 1980 Board, its president, and their successors, most of whom are no longer in office and thus cannot remedy the formal defects. That public detriment would result from invalidating the decision to end the Program at this late date is beyond cavil, for the practical effect of the majority's ruling is to render all similar prior Board votes vulnerable to like attack. None of the majority's cases requiring adherence to formalities is contrary. Of the five, four were contemporaneous challenges in which timeliness was apparently not at issue, and in the fifth (*Mettawa*), the court acknowledged the untimeliness but chose to resolve it, apparently because the defendant had elected to address the substance of the complaint without raising this defense.

Even considering defendants' challenge on its merits, moreover, they could not prevail. They argue, and the majority agrees, that the President had the power to reinstate the Program because no contrary formal Board vote occurred in 1980 or since to bar him from doing so. This reasoning, however, overlooks defendants' burden in this action: a *quo warranto* defendant must demonstrate affirmatively that the law provides the authority for the challenged conduct. (*Datacom*, 146 Ill. 2d at 38, 585 N.E.2d at 68.) Indeed, the essence of *quo warranto* proceedings is that one cannot justify assertions of power merely on the ground that nothing prohibits such actions.

Curiously, moreover, despite the majority's observation of the *leitmotif* of Dunne's history of unilateral power with regard to the Hospital, it fails to recognize the effect thereof: the Board's delegation to Dunne of its statutorily granted authority over the Hospital, including the power to terminate the Program. The majority's reasoning also ignores the authority of the Public Service Committee, a committee of the whole, to which the evidence indicates the Board delegated its

---

[8]Interestingly, it was the then-commissioners, including some of the plaintiffs here, who had standing to file such a suit against Dunne. I know of none, and given the committee vote without dissent in 1980, one was unlikely.

statutory grant of authority over the Hospital, and which, as the transcript of its public meeting demonstrates, formally concurred without dissent in the decision to terminate the Program.

I hasten to add that like the majority, I abhor traps for the unwary resulting from a legislature's failure to speak in accordance with statutorily mandated procedural formalities. That concern, however, simply is not at issue under the singular circumstances in this case. In light of the widespread contemporaneous publicity, including the public committee meeting with approximately 50 speakers, one cannot say that the 1980 Board acted in stealth. In light of the Board's history of delegating its powers to the President and the governing committee, the lopsided vote by the committee of the whole, and public acquiescence to the 12-year prohibition against elective abortions at the Hospital, one cannot say there is no existing policy on elective abortions for the purposes of the Ordinance.

V

At the outset, I stated that this case is about the separation of powers in Cook County government. As the circuit court observed, that abortions were the subject matter of this power struggle was "merely incidental." This case is *not* about abortion or whether to expend public funds for abortions.[9] Instead, the question it presents is who has the power to make that decision. As demonstrated above, the decision is not a matter for unilateral action by the chief executive officer of Cook County. It also is not a question for the judiciary. Instead, under the Ordinance, it is a question that the Board alone has the power to address.

With such authority comes responsibility. When, as here, elected legislative representatives have the power to express the general principles and purposes of government, citizens have the right to expect those representatives to take a public stand, no matter how controversial the issue. The Board's passage of a resolution purporting to "acknowledge the executive authority exercised by President Richard J. Phelan in Executive Order 92—1," as the circuit court aptly put it, was a "disingenuous [attempt] *** to implement elective abortions at Cook County Hospital *** without indicating any position for or against [doing so]." The majority opinion condones, nay encourages, what the circuit court characterized as "a perfect example of legisla-

---

[9]A State constitutional challenge to the statute restricting public funding of abortions to those necessary to preserve the life of the woman is currently before the circuit court of Cook County. Doe v. Edgar (1991), No. 91—CH—1958.

tive timidity that seeks the comfort of submitting a controversial issue to the judiciary, inviting it to be a surrogate decision maker on issues legislators were elected to decide."

Defendants failed to present any constitutional provision, statute, ordinance, common law, or historical precedent that would constitute an affirmative grant of power to the President to unilaterally reinstate the Program. Therefore, I would vacate the circuit court's order denying plaintiffs' motion for a preliminary injunction and remand for entry of judgment in favor of plaintiffs as well as for further proceedings under section 18—108 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 18—108), which requires factual determinations better made by the circuit court.